Maurice L. STONEHILL, Plaintiff,

v.

SECURITY NATIONAL BANK and John B. Fowler, Defendants.

No. 73 Civ. 1358.

United States District Court, S. D. New York.

June 30, 1975.

Havens, Wandless, Stitt & Tighe, New York City, for plaintiff.

Shea, Gould, Climenko & Kramer, New York City, for defendant Security National Bank.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendant John B. Fowler.

## OPINION

ROBERT L. CARTER, District Judge.

This action concerns a series of loans which allegedly violated the margin requirements of Regulation U, 12 C.F.R. § 221.1 *et seq.*, promulgated by the Federal Reserve Board pursuant to § 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g. All of the parties now move for summary judgment.

*The Pleadings*

Plaintiff Maurice L. Stonehill's amended complaint alleges that on or about January 21, 1970, plaintiff agreed to lend 24,000 shares of Jeanette Corporation ("Jeanette") common stock to defendant John B. Fowler, Jr.; that Stonehill agreed that the Jeanette stock was to be used by Fowler as collateral for a loan to provide working capital for Fowler and J. S. Love & Co., Inc. ("J. S. Love"), a duly registered broker-dealer of which Fowler was chairman, chief executive officer and stockholder; that plaintiff agreed that the working capital was to be used "to buy, sell, and trade registered securities * * * and to purchase such securities under certain underwritings;" that defendant Security National Bank ("Security") is the successor in interest of Royal National Bank of New York ("Royal"); and that Fowler pledged plaintiff's 24,000 shares

of Jeanette stock as collateral for a loan of $225,000 from Royal to Fowler for the benefit of Fowler and J. S. Love.

The first count of the amended complaint asserts that Royal's loan to Fowler violated Regulation U and § 7 of the Exchange Act. Regulation U provides that no bank shall grant any loan in an amount exceeding a certain percentage of the value of stock pledged as collateral (the "maximum loan value")[1] where the purpose of the loan is to "purchase or carry" margin stock[2].

Count 1 alleges that Fowler and J. S. Love used the proceeds of the loan for the purpose of purchasing or carrying margin stock;[3] that Royal knew or should have known that the proceeds would be used for that purpose; that the amount of the loan exceeded the maximum loan value of the 24,000 Jeanette shares; that Fowler defaulted on payment of the loan; and that Security still holds the Jeanette collateral. Count 1 seeks a declaratory judgment declaring the loan to Fowler void as a violation of Regulation U, and an injunction ordering Security to return the 24,000 Jeanette shares to Stonehill free of all liens and claims. The second count asserts that Fowler obtained the Jeanette shares from plaintiff by fraud; that Royal knew or should have known of the fraud; that Royal was therefore not a holder in due course of plaintiff's stock; and that plaintiff was wrongfully deprived of possession of his stock. Plaintiff seeks damages for the loss in value of his stock from the date of its delivery to Royal to the present.

In addition to a general denial, Security's answer contains a counterclaim which alleges that in order to induce Royal to make loans to Fowler, plaintiff executed a written "Guarantee of All Liability" of defendant Fowler ("the guarantee"); that Royal lent funds to Fowler in reliance on the guarantee; that neither Fowler nor plaintiff has repaid the loans; and that plaintiff is liable on the guarantee for the outstanding balance of $215,000.

Stonehill's reply asserts as an affirmative defense that the loan to Fowler is void as a violation of Regulation U, and that the guarantee is void as a violation of Regulation U and contrary to public policy.

In its cross-claim, Security seeks to recover against Fowler on his note for the outstanding balance of $215,000. In his answer, Fowler asserts by way of affirmative defense, *inter alia*, that the loan violated Regulation U and was contrary to public policy; that Royal knew or should have known that fact; and that the loans were therefore void and unenforceable. Fowler also cross-claims for a declaratory judgment declaring the loans null and void and for an order directing the return of the 24,000 shares.

### The Instant Motions

Plaintiff Stonehill now moves for summary judgment with respect to his claims against Security and Security's counterclaim; and Security moves for summary judgment dismissing the amended complaint and granting the relief requested in its counterclaim against Stonehill. In addition, defendant Fowler moves for summary judgment dismissing Security's cross-claim and granting the declaratory and other relief sought in his cross-claim against Security.

### Factual Background

The following facts, which are relevant to all of the instant motions, are substantially undisputed. Defendant

---

1. As set forth more fully below, the maximum loan value of stock is set from time to time by the Federal Reserve Board in a schedule in 12 C.F.R. § 221.4.

2. Loans whose purpose is to purchase or carry margin stock are termed "purpose loans" in Regulation U and hereinafter.

3. This allegation was made on information and belief.

Fowler, a resident of Pennsylvania, has been a stockbroker and registered representative since 1936. From on or about January 2, 1970, to January 5, 1972, he was chairman, chief executive officer, and principal shareholder of J. S. Love. J. S. Love is a duly registered brokerage firm, underwriter and member of the New York Stock Exchange which trades in securities for customers and on its own account. In 1970, Fowler knew that banks were subject to restrictions on the amounts they could lend. He believed that the reason banks were required to secure U-1 Forms from customers stating the purposes of their loans was "for the bank to conform to Regulation U." Prior to 1970 and before the loans here in issue, Fowler had taken out stock-earned loans for the purpose of purchasing stock, and he had been required to sign Regulation U statements. (Fowler Tr. 119–23).[4]

In 1970, plaintiff Stonehill, a resident of Ohio, was president, chairman of the board and chief executive officer of Jeanette Corporation, a Pennsylvania glass manufacturing company whose common shares are listed on the American Stock Exchange. Stonehill owns 175,000 shares or 17% of the total outstanding common stock of Jeanette, and Stonehill's shares are "control" stock within the meaning of the Securities Act of 1933. Stonehill and Fowler met in 1958 or 1959 and became friends, and Fowler served on the board of Jeanette until his resignation in 1971.

Royal National Bank, Security's predecessor in interest,[5] was a national bank subject to Regulation U in 1970 and 1971. Herbert D. Bacher, an executive vice president of Royal, was the account officer who handled the six separate loan transactions with Fowler which are involved in this case.

In and around January, 1970, Stonehill, at Fowler's request, lent Fowler a total of 48,013 shares of Jeanette common stock on two separate occasions. (Fowler Tr. 32–33; Stonehill Tr. 14–16). The same month, Stonehill also signed three documents: a "Guarantee of All Liability" of Fowler to Royal; a "Collateral Loan Agreement"; and a letter of consent to hypothecation of 5,000 shares of Jeanette stock. In April, Stonehill refused to sign a letter of consent to hypothecation of 24,000 Jeanette shares.[6] Fowler told Stonehill that he would repay the bank loans and return the stock in about 45 days. (Fowler Tr. 33–34).[7]

As noted, six loan transactions are involved in this case:

(1) On January 21, 1970, Royal lent Fowler $100,000,[8] secured by 5,000 shares of Jeanette stock.[9] This loan was repaid in full, and the 5,000 shares of Jeanette stock were returned to Fowler. Thus none of the parties seeks relief as to this loan. Evidence of the circumstances surrounding this loan may, however, bear on the parties' knowledge of the purposes of the other loans.

---

4. References to "Tr." followed by a page number are to the deposition transcripts of four witnesses.

5. Royal was merged into Security in May, 1972, after the events here in issue.

6. Security generally "denies" this in Paragraph 4 of its 9(g) statement in opposition to Stonehill's motion. This and other "denials" in Security's 9(g) statements are wholly improper as to form and are insufficient to raise an issue of material fact. *See* Wilson Jones Co. v. Gilbert & Bennett Mfg. Co., 332 F.2d 216, 219 (2d Cir. 1964). This particular denial is contradicted by Stonehill's testimony that he refused such a consent (Stonehill Tr. 45) and the fact that Security is unable to produce a signed consent.

7. The evidence as to Stonehill's knowledge and understanding of the purpose of the loans of stock and the bank loans to Fowler is set out below.

8. The promissory notes signed by Fowler for each of the six loans are included among the exhibits presented on this motion.

9. It was in respect of this loan alone that Stonehill signed the consent to hypothecation of 5,000 Jeanette shares.

(2) On April 14, 1970, Royal lent $50,000 to Fowler, secured by 6,000 shares of Jeanette stock and payable October 14, 1970.

(3) On April 23, 1970, Fowler borrowed an additional $150,000 due October 23, 1970, secured by 18,000 additional shares of Jeanette stock plus the 6,000 shares already held by Royal.

(4) On December 28, 1970, $25,000 of Fowler's indebtedness was repaid, and the outstanding loans were consolidated into a single loan of $175,000, secured by the 24,000 shares of Jeanette stock.

(5) On March 15, 1971, Fowler borrowed an additional $50,000, secured by the 24,000 Jeanette shares already in Royal's possession.

(6) On November 1, 1971, the loans were consolidated into a single loan of $225,000, of which only $10,000 has been repaid. Fowler has defaulted on the balance of $215,000, and the 24,000 Jeanette shares remain in Security's possession.

Attention will be focused on the three *outstanding* loans of April 14, 1970, April 23, 1970, and March 15, 1971.

*Discussion*

Before considering the alleged violations of Regulation U on the merits, the court must determine whether plaintiff as a guarantor has a right of action under Regulation U, and the nature of his obligation, if any, under the guarantee.

*Right of Action by Guarantor*

In determining whether a guarantor should have a right of action, the nature of the right accorded a *borrower* must first be examined. In *Serzysko v. Chase Manhattan Bank*, 290 F.Supp. 74 (S.D.N.Y.1968), *aff'd mem.*, 409 F.2d 1360 (2d Cir.), *cert. denied*, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969) the leading decision on Regulation U, the court held that there was a dual basis for the borrower's action. The borrower's declaratory action to void the loan and his *defense* to the bank's action to enforce the obligation both rest on § 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b). That section provides that any contract which violates the Act or regulations thereunder is void as regards the rights of the violator.[10] *See Cooper v. Union Bank*, 354 F.Supp. 669, 682 (C.D. Cal.1973). The borrower's action for damages, on the other hand, is based on § 286 of the Restatement of Torts (1934), which gives a private tort action for violation of a statute to one who is within the class of persons intended to be protected by the statute.[11] 290 F. Supp. at 88–90. *Remar v. Clayton Securities Corp.*, 81 F.Supp. 1014 (D.Mass. 1949); *Goldman v. Bank of Commonwealth*, 467 F.2d 439, 446 (6th Cir. 1972), *aff'g* 332 F.Supp. 699 (E.D. Mich.1971); *see Grove v. First National Bank of Herminie*, 352 F.Supp. 1250, 1252 (W.D.Pa.1972), *aff'd*, 489 F.2d 512 (3d Cir. 1973).

---

10. Section 29(b) provides in pertinent part:
 "(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract * * *."

11. Section 286 of the Restatement of Torts provides in pertinent part:
 "§ 286. VIOLATIONS CREATING CIVIL LIABILITY.
 "The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if:
 "(a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and
 \* \* \* \* \*
 "(d) the violation is a legal cause of the invasion, and the other has not so conducted himself as to disable himself from maintaining an action."

■ However, an examination of the legislative history of § 7 has led courts to question whether the borrower's action should properly be based on § 286, for it is clear that protection of the borrower-investor was not the primary legislative objective in enacting the margin provisions: [12]

"The main purpose of these margin provisions * * * is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of law. *Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly*—although such a result will be achieved as a by-product of the main purpose." H.R. Rep. No. 1383, 73d Cong., 2d Sess. 8 (1934). (Emphasis added). *See Pearlstein v. Scudder & German*, 429 F.2d 1136, 1147 (2d Cir. 1970) (Friendly, J. dissenting), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971).

The "main purpose" of the margin rules was to regulate the volume of credit flowing into the securities market:

"The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market and out of other more desirable uses of commerce and industry—to prevent a recurrence of the pre-crash situation where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry and agriculture, were drained by far higher rates into security loans and the New York call market." H.R.

Rep. No. 1383, 73d Cong., 2d Sess. 8 (1934).

In its *Report of Special Study of Securities Markets*, 88th Cong., 1st Sess. Ch. X, 9 (1963), the SEC similarly stated that its primary concern in respect of the margin rules is *not* to protect the small investor from loss, but to prevent speculative swings in securities prices:

"* * * [T]he Commission's primary concern is the efficacy of security credit controls in preventing speculative excesses that produce dangerously large and rapid securities price rises and accelerated declines in the prices of given securities issues and in the general price level of securities. Losses to a given investor resulting from price declines in thinly margined securities are not of serious significance from a regulatory point of view. When forced sales occur and put pressures on securities prices, however, they may cause other forced sales and the resultant snowballing effect may in turn have a general adverse effect upon the entire market."

Finding that the legislative history provides little support for an implied action by a borrower under § 286, the court in *Serzysko, supra*, 290 F.Supp. at 88, also relied on the reasoning of *J. I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423, 427 (1964), where the Supreme Court held that a private right of action under § 14(a) of the Exchange Act was a "necessary supplement to Commission action" in the enforcement of the proxy rules. Similarly, the most compelling rationale for allowing private actions under Regulation U is the need to supplement action by the Federal Reserve Board to enforce compliance by banks [13] with the margin requirements.

---

12. *See* Note, *Federal Margin Requirements as a Basis for Civil Liability*, 66 Colum.L. Rev. 1462, 1468 (1966) (hereinafter, "Note, *Federal Margin Requirements.*")

13. The language in Regulation U places the entire burden of compliance on the bank. 12 C.F.R. § 221.1(a) provides: "* * * [N]o bank shall extend any credit [in viola-

■ If the primary justification for a private action is not the protection of the borrower under § 286 of the Restatement, then there is no reason for restricting the right of action to the borrower. Indeed, in order to promote the primary objective of aiding in the enforcement of Regulation U, it would seem most important to allow a right of action to the guarantor. If the guarantor is not allowed to sue for affirmative relief under Regulation U or to rely on the invalidity of the illegal loan under § 29(b) as a defense in an action on the guarantee, then a bank could violate Regulation U with impunity merely by obtaining a guarantor for its loans. Accordingly, I hold that Stonehill has the right to sue for damages and the return of his stock and to assert the alleged voidability of the guarantee and the underlying loan by way of defense or in his declaratory action.

In opposing the position taken here, Security frames the issue as one of standing, and, relying on *Natkin v. Exchange Nat'l Bank of Chicago*, 342 F.2d 675 (7th Cir. 1965), argues that only the borrower may assert a violation of Regulation U. In that case, the plaintiffs had delivered securities endorsed in blank to one Ben Notkin who had pledged them as additional collateral for an existing loan which violated Regulation U. Notkin had sued the bank for damages in the same action, but after he had gone bankrupt, the trustee had settled the action, receiving substantial damages and releasing the bank. The court found that the bank did not participate in any way in the loan of stock by plaintiffs to Notkin and that there was no contractual relation or privity between the plaintiffs and the bank. The court held that the effect of § 29(b) is to void the *contractual rights* of a party in violation, and that § 29(b) does not

create a right of action in favor of "strangers" to the contract such as the plaintiffs had been found to be. 342 F. 2d at 676.

As must be clear from the previous discussion, I disagree with *Natkin's* narrow position that a private action is restricted by the terms of § 29(b). Moreover, *Natkin* is wholly distinguishable on its facts. There plaintiffs' sole contact with the bank was that they had supplied the collateral; they had no contractual relationship.[14] In this case, by contrast, Stonehill entered into a direct contractual relation with Royal through the guarantee and the stock powers. The clearest indication that there was a contractual relationship and privity between the bank and Stonehill is that the bank is suing Stonehill on the guarantee, whereas in *Natkin*, the bank had no cause of action whatever against plaintiffs. Moreover, in *Natkin*, the bank had already settled with the borrower, paid damages representing the value of certain of the collateral, and received a release. Here Fowler remains a party, and Security has neither paid damages nor received a release.

Two other cases cited by Security are distinguishable on similar grounds. In *Levin v. Great Western Sugar Co.*, 274 F.Supp. 974, 979 (D.N.J.1967), the derivative shareholder plaintiff alleged that another company would seek to merge with plaintiff's own company by purchasing shares of plaintiff's company with funds borrowed in violation of Regulation U. The court held that plaintiff had no right of action because she was not in "privity" with the lending bank. In *Meisel v. North Jersey Trust Co. of Ridgewood, New Jersey, Inc.*, 218 F. Supp. 274 (S.D.N.Y.1963), it was similarly found that plaintiff was not a party to a brokerage transaction which allegedly violated Regulation T. In the

---

tion of Regulation U] * * *. *See* Note, *Federal Margin Requirements*, *supra* note 12, at 1464.

14. The briefs in Natkin indicate that plaintiffs conceded that they were strangers to the transaction between Notkin and the bank.

instant case, Stonehill, as guarantor, participated to a sufficient degree in the allegedly unlawful loan transactions to allow him a right of action. Moreover, as noted, the deterrence considerations stated in *Borak* require this result.[15]

Security also relies on several authorities which have construed § 29(b) to render an unlawful contract not "void", but "voidable" at the option of the borrower. Thus in *Goldman v. Bank of Commonwealth, supra,* 332 F.Supp. at 706, the district court said:

> " * * * contracts subject to the Draconian language of 15 U.S.C. § 78cc(b) are nonetheless not truly 'void' but more properly are 'voidable' since the law in effect gives an innocent party the right to affirm or rescind. [citations omitted]"

Having paraphrased § 29(b) in this fashion, Security then cites New York State authorities which state that only the principal borrower may rescind a "voidable" obligation, *e. g., Ettlinger v. National Surety Co.,* 221 N.Y. 467, 469–70, 117 N.E. 945 (1917).

■■ This argument is of no help to Security, however. First, § 29(b) is not phrased in terms of "voidability," and it makes no mention of the innocent party. It states that the contract is "void * * * as regards the rights of the violator." I interpret this to mean that the violator may not enforce his claimed contractual rights against anyone, no matter whom. As the passage quoted above from *Goldman v. Bank of Commonwealth, supra,* makes clear, the reason for paraphrasing § 29(b) in terms of "voidability" is to make clear

that an innocent party may *enforce his rights*; the intent is not to preclude a guarantor from voiding his obligation. Second, even under New York State law, a guarantor is in privity with the borrower for certain purposes, and may void a guarantee for such statutory violations as usury. *Barrett v. Conley,* 35 Misc.2d 47, 228 N.Y.S.2d 992 (Sup.Ct. 1962). Third, as noted, Stonehill's action and defense to Security's counterclaim rest not only on § 29(b), but on § 286 of the Restatement and the rationale of *J. I. Case Co. v. Borak, supra.*

■ In summary, I find that Stonehill, as guarantor of the loans in this case, has a right of action under Regulation U, and has standing to assert the alleged violations of Regulation U.

### The Guarantee Is Void if the Principal Debt Violates Regulation U

■ Security argues that even if Fowler's obligations are void or voidable as violations of Regulation U, Stonehill may still be held liable on his guarantee. I disagree. In the previous section, I found that it was essential for a guarantor to have a right of action to ensure effective enforcement of Regulation U and to prevent banks from evading the regulation by the simple expedient of obtaining a guarantor. For the same reason, I now hold, as a matter of substantive law, that if the principal obligation violates Regulation U, a guarantee of that obligation is void under § 29(b) of the Exchange Act. The guarantor also has a substantive cause of action for damages and other affirmative relief, in this case the return of the guarantor's collateral.

---

15. Meisel, *supra,* rests at least in part on the theory that the right of action arises under § 286 of the Restatement of Torts. As noted, in light of the legislative history of § 7, § 286 is not a sufficient basis for the customer's action, and it does not justify confining the right of action to a customer of a broker. Meisel was decided before the Supreme Court's decision in J. I. Case Co. v. Borak, *supra,* which furnishes a more com-

pelling rationale for the guarantor's right of action.

The case of Friedman v. Belgian-American Banking Corp., CCH Fed.Sec.L.Rep. ¶ 91,521 at 94,947 (S.D.N.Y.1965), where the court refused to allow a right of action to a creditor of the borrower is distinguishable on the ground that there the creditor did not participate in any way in the loan transaction that allegedly violated Regulation U.

In opposing the position taken here, Security first argues generally that under New York law,[16] a guarantor may not rely on the voidability of the principal obligation in an action on the guarantee. The case of *Mohasco Industries, Inc. v. Giffen Industries, Inc.*, 335 F. Supp. 493 (S.D.N.Y.1971) (Bryan, J.), cited by Security does not, however, support its position. In *Mohasco*, one of the guarantor's defenses [17] was that the principal debtor had an antitrust claim pending against the obligee. The court held that a guarantor may not " ' * * * avail himself of an *independent* cause of action existing in favor of his principal as a defense * * * ' ", and specifically found that the principal debtor's debt "is *completely independent* of its antitrust claims against [the obligee]." 335 F.Supp. at 498. (Emphasis added). *Mohasco* is wholly distinguishable from the present case since here the alleged violation of Regulation U involved Fowler's debt which underlies Stonehill's alleged obligation as guarantor.

Security next directs the court's attention to a clause in the guarantee which states that the guarantee is to be enforced irrespective of the validity of the underlying obligation:

" * * * This guarantee shall be construed as a continuing, absolute and unconditional guarantee of payment, without regard to the validity, regularity or enforceability of any of said Obligations or purported Obligations * * *."

Under New York law, a guarantee containing such a clause will be construed to be broader than the principal obligation, and in some circumstances the guarantee may be enforced even though the principal obligor has a defense in respect of his narrower obligation. *Bank of North America v. Shapiro*, 31 A.D.2d

465, 298 N.Y.S.2d 399 (1st Dept. 1969); *Standard Brands, Inc. v. Straile*, 23 A. D.2d 363, 260 N.Y.S.2d 913 (1st Dept. 1965); *Cross v. Rosenbaum*, 7 Misc.2d 309, 161 N.Y.S.2d 337 (Sup.Ct.1957).

However, in none of the cases cited above did the underlying obligation involve an alleged violation of the federal securities laws. Section 29(a) of the Exchange Act, 15 U.S.C. § 78cc(a), states that any contractual provision purporting to waive compliance with the Exchange Act or any regulation thereunder shall be void:

" (a) Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."

In *Pearlstein v. Scudder & German, supra,* where plaintiff had signed a stipulation of settlement of a state court suit in which he promised to repay loans extended in violation of Regulation T, the Court of Appeals held the stipulation void on the ground that it would "serve only to legalize the very extension of credit which the margin requirements seek to prevent." 429 F.2d at 1143. Likewise, I have found that to allow a bank to recover on a guarantee even though the underlying loan violated Regulation U would encourage banks to extend credit in violation of the margin requirements. I therefore hold that insofar as a guarantee provision purports to allow a bank to recover on a guarantee even though the underlying loan violates Regulation U, it is void as a violation of § 29(a) of the Exchange Act.

*Conclusion*

If it is established that any of Royal's loans to Fowler violated Regulation U, Stonehill's guarantee is *pro tanto* unenforceable, and a proportionate number of

---

16. One of the jurisdictional bases of Stonehill's action is diversity of citizenship. Thus issues of contract law are governed by the law of New York.

17. The principal ground of the decision holding the guarantor liable was that the guarantor had failed to establish his defense of fraud in the inducement.

the Jeanette shares held as collateral must be released.

### The Alleged Violations of Regulation U

██ Three elements must be shown in order to establish a violation of Regulation U: that the credit was extended for the purpose of purchasing or carrying margin stock [18]; that the loan was secured directly or indirectly by *some* stock (whether or not margin stock); and that the amount of the loan exceeded the maximum loan value of the collateral.[19] *Cooper v. Union Bank, supra*, 354 F.Supp. at 675.

There is no dispute that the latter two elements have been established. All three loans in issue [20] were directly secured by Jeanette Corporation common stock.

In addition, each loan exceeded the maximum loan value of the stock which secured it.[21] The maximum loan percentage at the time of the April 14 and April 23, 1970, loans was 20% of the value of the stock collateral; at the time of the March 15, 1971, loan, the maximum percentage was 35%.[22] The market value of the 6,000 Jeanette shares securing the April 14 loan of $50,000 was $120,000, as set forth in the Form U-1 executed therewith. The maximum loan value was 20% of $120,000 or $24,000—less than half the amount of the loan granted.

██ The April 23 loan of $150,000 increased Fowler's indebtedness to $200,000, secured by 18,000 additional Jeanette shares, valued at $306,000, plus the 6,000 shares valued at $120,000 [23] The maximum loan value of the 18,000 additional shares was 20% of the $306,000, or $61,200, making a total loan value of $85,200, which was again substantially less than the outstanding balance of $200,000.

In the Form U-1 executed in connection with the March 15, 1971, loan of $50,000, the market value of the 24,000 shares is stated to be $600,000; the maximum loan value at that time was thus $210,000, substantially less than the outstanding balance of $225,000.[24]

---

18. Since July, 1968, the term "margin stock" has been defined to include not only securities registered under § 12 of the Exchange Act, but certain over-the-counter stocks and various other securities.

19. 12 C.F.R. § 221.1(a) provides in pertinent part:
 "(a) *Purpose credit secured by stock.* (1) * * * [N]o bank shall extend any credit secured directly or indirectly by any stock for the purpose of purchasing or carrying any margin stock in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time for stocks in § 221.4 (the Supplement to Regulation U) * * *."

20. As stated above, attention will be focused primarily on the loans of April 14, 1970 ($50,000); April 23, 1970 ($150,000); and March 15, 1971 ($50,000).

21. The analysis of each loan in the text assumes that if only a portion of the loan was a purpose credit, the collateral should be allocated pro rata between the purpose and non-purpose portions of the loan in determining whether the purpose portion exceeded the maximum loan value of the collateral.

The problem is considered again, *infra*, at 45 n. 42.

22. The 20% maximum loan value obtained from June 8, 1968—May 5, 1970. The 35% value was in effect from May 6, 1970—December 3, 1971. 12 C.F.R. § 221.4.

23. The two loans must be considered a single loan, and all collateral securing that loan must be considered in determining whether there has been a violation. 12 C.F.R. § 221.1(d) provides:
 "(d) *Single credit rule.* For the purpose of this part, except for credit subject to § 221.3(s) or (t), the entire amount of the purpose credit extended to any customer by any bank at any time shall be considered a single credit; and all the collateral securing such credit shall be considered in determining whether or not the credit complies with this part."

24. Even if the market value of the 24,000 shares had risen to $700,000 such that the maximum loan value as of March, 1971, was $245,000, exceeding the total outstanding debt, this could not in any way affect the legality of the previously existing loans of $175,000. Regulation U is concerned only

Thus, the only remaining issue is whether the purpose of any or all of the three loans in question was to purchase or carry[25] securities. It is to be noted that there must be a separate showing of purpose with respect to *each* of the three loans; and if one loan is found to be a purpose loan, the mere fact that the same collateral secured all three loans will not justify a finding that all three loans were purpose loans. *Daley v. Capitol Bank and Trust Co.,* 506 F.2d 1375, 1377 (1st Cir. 1974); *see Tartell v. Chelsea National Bank,* 351 F.Supp. 1071, 1076 (S.D.N.Y.), *aff'd,* 470 F.2d 994 (1972). None of the authorities contains a comprehensive discussion of the "purpose" requirement. However, the facts in this case should be considered in light of three factors, discussed in more detail below: (1) whether the *borrower intended* to use the loan proceeds to purchase or carry margin stock; (2) whether the proceeds of each loan were actually used for that purpose, *e.g., Tartell v. Chelsea National Bank, supra;* and (3) whether the lending bank knew or should have known of the borrower's intention and the use of the proceeds. *Serzysko v. Chase Manhattan Bank, supra.*

Before turning to the three loans in issue, it would be well to examine certain undisputed facts as to the relationship between Fowler and Royal, and the circumstances of the January 21, 1970, loan which are relevant to Royal's knowledge of the intended and actual use of the three loans in issue. Herbert D. Bacher, the executive vice president of Royal who handled the Fowler loans, knew that Fowler was chairman and chief executive officer of J. S. Love (Bacher Tr. 54), and that J. S. Love, a depositor of Royal (Bacher Tr. 18), was a retail brokerage house (Bacher Tr. 54), although he did not know that J. S. Love bought and sold securities for its own account. (Bacher Tr. 58–59). Bacher's wife had a brokerage account with J. S. Love. (Fowler Tr. 28; Bacher Tr. 56).

The following facts concerning the January 21, 1970, loan of $100,000 are undisputed. The Form U–1 ("purpose statement"), executed by Fowler as required by Regulation U, stated that the proceeds of the loan were to be used for a "temporary loan to J. S. Love & Company, Inc." Fowler and Bacher discussed the loan (Bacher Tr. 55), but there was no specific mention of Regulation U. (Fowler Tr. 25–26).

The parties are in dispute about certain details of the conversation. Fowler testified that he told Bacher that J. S. Love needed the loan proceeds for excess capital to take down its share of a firm commitment underwriting of Display Sciences stock. (Fowler Tr. 27). Bacher remembered a discussion of Display Sciences, but did not recall that it was in connection with this loan. (Bacher Tr. 55).[26] Bacher further testified that he regarded the loan as a loan to Fowler, not J. S. Love, and that he consid-

---

with the *initial* margin requirements, and the court considers the value of the stock only at the time the loan is taken out; subsequent fluctuations in the value of the collateral do not affect the validity of the loan. Lichtenstein v. American Bank & Trust Co., CCH · Fed.Sec.L.Rep. ¶ 94,128 (S.D.N.Y. 1973); Note, *Federal Margin Requirements, supra* note 12, at 1465; *SEC Report on Special Study of Securities Markets, supra,* CH X, 5.

In the hypothetical above, the only effect of the indicated increase in the value of the collateral would be to validate the incremental loan of $50,000 in March, 1971.

25. 12 C.F.R. § 221.3(2) defines the phrase "for the purpose of 'carrying'" securities as follows:

"(2) Credit to enable the customer to reduce or retire indebtedness which was originally incurred to purchase a margin stock is for the purpose of 'carrying' such a security."

26. Fowler also testified that Bacher discussed with Fowler his wife's purchase of Display Sciences stock. (Fowler Tr. 27–28).

ered it a non-purpose loan. (Bacher Tr. 57–59).

Nonetheless, it is undisputed that Bacher believed that Fowler would use the proceeds for an "investment" in J. S. Love; that Bacher knew of a section of Regulation U relating to loans to brokerage houses;[27] and that neither Bacher nor any other Royal officer made an independent investigation of the use of the proceeds. (Bacher Tr. 57–58). Bacher knew that J. S. Love & Co. was an underwriter of Display Sciences, and he did not know that the proceeds of the Royal loan would *not* be used to buy marketable securities. (Bacher Tr. 56–57).

As to the actual use of the proceeds, Fowler testified that after the proceeds were deposited in his personal account, he wrote out a check for $100,000 to J. S. Love. J. S. Love then advised the New York Stock Exchange that it had sufficient capital to take down the Display Sciences underwriting. (Fowler Tr. 25). Unfortunately, the circumstances surrounding the three outstanding loans actually in issue were less fully developed in the depositions.

### (1) *The April 14, 1970, Loan*

There can be no dispute that the Form U–1 executed by Fowler again stated that the proceeds were to be used for a "temporary loan to J. S. Love & Company, Inc."

However, the deposition testimony as to Fowler and Bacher's conversation in Bacher's office is unclear. Fowler testified that they discussed the proposed secondary offering of stock of Capital National Bank of Tampa in which J. S. Love was a co-underwriter. (Fowler Tr. 50–51). Fowler did not testify specifically that he told Bacher that the proceeds were to be used to finance the underwriting. Bacher stated that he had no recollection of a conversation regard-

ing why Fowler needed the loan. (Bacher Tr. 77). He knew J. S. Love was part of an underwriting group for Capital National Bank of Tampa, "but nothing pertaining to this loan for that purpose." Fowler did not, however, say that the loan was *not* to be used for the underwriting. (Bacher Tr. 78).

Fowler's testimony as to the *actual* use of the proceeds is not disputed, as far as it goes.[28] Fowler testified that on or after April 14, 1970, $50,000 was credited to his account, and he wrote out a check for $50,000 to J. S. Love which was used for the purpose of "building up our balances" for the Capital National Bank underwriting. (Fowler Tr. 51–52). Fowler could not trace the specific $50,000 borrowed, as it was commingled with other funds in the general, working capital account. (Fowler Tr. 118).

### (2) *The April 23, 1970, Loan*

As in the case of the previous loans, the Form U–1 executed in respect of the April 23 loan stated that the purpose was a "temporary loan to J. S. Love & Company, Inc."

There is a conflict in the testimony as to the conversation between Fowler and Bacher. Fowler claims that he explained to Bacher "specifically" the purpose of the $150,000 loan (Fowler Tr. 69): the proceeds were to be added to the $50,000 previously borrowed to provide capital for the Capital National Bank underwriting. (Fowler Tr. 62). Bacher testified that "to the best of my knowledge, I have no recollection" of the purpose or application of the proceeds. (Bacher Tr. 84).

It is undisputed, however, that the bank made no independent inquiry as to the use of the proceeds (Bacher Tr. 84), even though Bacher knew that J. S. Love had "something to do with" the Capital National Bank underwriting. Bacher's wife bought one or two hun-

---

27. This testimony may refer to 12 C.F.R. § 221.103, discussed in detail below.

28. The other parties do not of course have the same access to information as to the use of the proceeds as does Fowler.

dred shares of Capital National Bank in this offering. (Bacher Tr. 88). Fowler's testimony contains no express statement as to the *actual* use of the proceeds.

### (3) *The March 15, 1971, Loan*

The Form U–1 executed by Fowler states that the purpose of the March 15 loan was "to pay back advance to J. S. Love & Co., Inc."

As to the actual use of the loan, Fowler testified that on the previous day, he had advanced $50,000 on his personal account to J. S. Love for working capital; the proceeds of the loan from Royal were used to replenish his account. (Fowler Tr. 77).

On the issue of Royal's knowledge of the purpose, Bacher testified that Fowler did *not* indicate to him that the funds were given to J. S. Love to enable it to pay back advances Fowler had made to J. S. Love. (Bacher Tr. 92). Fowler did not testify that he explained the purpose of *this* loan to Bacher.

### *Discussion*

 Summary judgment should be granted only where "the pleadings [and] depositions * * * together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), F.R.Civ.P. The movant has the burden of showing that there are no genuine issues of material fact. *First National Bank of Cincinnati v. Pepper*, 454 F.2d 626 (2d Cir. 1972); C. Wright and A. Miller, *Federal Practice and Procedure*, Civil § 2727 (1973 ed.). The inferences drawn from the facts are construed against the movant. *Sommer v. Hilton Hotels Corp.*, 376 F. Supp. 297 (S.D.N.Y.1974); *Society of the New York Hospital v. Associated Hospital Service of New York*, 367 F. Supp. 149 (S.D.N.Y.1973), and even if the evidentiary facts are undisputed, summary judgment must be denied if the inferences drawn from the facts are disputed. *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272 (2d Cir. 1967). Thus summary judgment is frequently denied in Regulation U cases which usually turn on inferences to be drawn from facts. *Freeman v. Marine Midland Bank of New York*, 494 F.2d 1334 (2d Cir. 1974) (unresolved issue whether loan was indirectly secured by stock); *Bender v. New Zealand Bank & Trust (Bahamas), Ltd.*, 67 F.R.D. 638 (S.D.N.Y.1974) (Motley, J.) (triable issue whether transaction should be characterized as a loan); *Serzysko v. The Chase Manhattan Bank*, CCH Fed.Sec.L.Rep. ¶ 91,676 (S.D.N.Y.1966) (Murphy, J.) (disputed issue whether plaintiff misrepresented purpose to bank); *Friedman v. Belgian-American Banking Corp., supra* (issues as to disposition and use of funds, and as to whether bank was informed of borrower's intention to use loan proceeds to purchase and sell securities).

 On the first issue in regard to purpose—the borrower's subjective *intent* to use the proceeds to purchase or carry securities—the Form U–1 statements furnish practically indisputable proof of Fowler's intent that the proceeds of all three loans be lent to J. S. Love. Fowler's deposition testimony supports a finding that he intended that the proceeds of the first two loans [29] in issue be used by J. S. Love to purchase margin stock in connection with an underwriting. Fowler's testimony also shows that he intended that J. S. Love use the proceeds of the third loan for "working capital." (Whether loan proceeds actually used by a brokerage firm for "working capital" will be deemed to be used to purchase or carry margin stock is considered below.) Security has failed to show that Fowler denied this

**29.** That is, the loans of April 14, 1970, and April 23, 1970.

intention to Bacher, and has not offered any other proof contradicting his testimony. Although summary judgment ordinarily must be denied with respect to an issue of purpose or intent, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), it is appropriate here, since Security has not indicated that it could offer any proof at trial to refute Fowler's testimony. *Dyer v. MacDougall*, 201 F. 2d 265 (2d Cir. 1952).

The standard to be applied in respect of the second issue—the *actual use* of the proceeds is unclear. Some administrative interpretations indicate that if loan proceeds are used for a loan or contribution of capital to a *brokerage firm*, there need be little or no proof that the brokerage firm actually purchased or carried margin stock with those specific funds in order to establish that the loans were purpose loans. In a hypothetical appearing in an early interpretation of the purpose requirement by the Federal Reserve Board, it was assumed that a bank loan "is made to one or more individuals to enable them to contribute capital to a stock brokerage firm." The brokerage firm "purchases and carries for customers stocks that are registered on a national securities exchange." It was not, however, expressly assumed that the proceeds of the loan were actually used to purchase or carry registered securities. Nonetheless, it was "the view of the Board that all such loans should be considered to be for the purpose of purchasing or carrying registered stock." 32 F.R.B. 995 (1946). An opinion by the Chief of the Securities Regulations Division of the Federal Reserve Board based on the facts of this case and obtained by Stonehill in connection with this litigation reflects a similar view. (*See* Plaintiff's Exhibit 33). There it was assumed that "Mr. Y. [is] a chief executive officer of an incorporated registered broker/dealer (Z, Inc.)." The proceeds of a bank loan to Mr. Y "would be turned over to Z, Inc. for *use in its business.*" (Emphasis added). The interpretive letter stated that the loan should be treated as a purpose loan,[30] without further proof that the brokerage house actually used the proceeds to purchase or carry margin stock.

Fowler and Stonehill also rely on *Cooper v. Union Bank, supra,* where the loan agreement between plaintiffs and the lending institution provided that the loan would be used for "working capital" for plaintiff's business of selling put and call options. *Cooper* does not, however, support the view that there need be no showing of actual use by the brokerage house since the court expressly found that both loans in the case were used "for the purpose of *purchasing margin stocks* to be used in the put and call business." 354 F.Supp. at 672–73. (Emphasis added).

Indeed, recent authorities support the view that there must be a showing that the brokerage house actually used the proceeds to purchase or carry margin stocks. The provision of Regulation U concerning loans to broker-dealers on which Fowler and Stonehill principally rely implies that there must be *actual use* of the proceeds "for purchasing and carrying securities for the account of customers" in order for the loan to be deemed a purpose loan:

"§ 221.103 Loans to brokers or dealers

"Questions have arisen as to the adequacy of statements received by lending banks under § 221.3(a) in the case of loans to brokers or dealers secured by stock where the proceeds of the loans are to be *used to finance customer transactions involving the purchasing or carrying of registered stocks.*

"While some such loans may qualify for exemption under § 221.2, unless

---

30. The letter also assumed that the lending bank had the requisite awareness of the circumstances, and that the loan did not qualify for an exemption from Regulation U.

they do qualify for such an exemption they are subject to this part. For example, if a loan so secured is made to a broker to furnish cash working capital for the conduct of his brokerage business (i.e., *for purchasing and carrying securities for the account of customers*), the maximum loan value prescribed in § 221.4 would be applicable unless the loan should be of a kind exempted by § 221.2. This result would not be affected by the fact that the stock given as security for the loan was or included stock owned by the brokerage firm." 12 C.F.R. § 221.103. (Emphasis added) [31]

In *Daley v. Capitol Bank and Trust Co., supra,* the trial court had found that one loan to plaintiff was a purpose loan, while three were not. On appeal, the Court of Appeals for the First Circuit rejected plaintiff's contention that all four loans should be deemed purpose loans because the bank had failed to segregate the collateral for the three non-purpose loans from that securing the one purpose loan, and because all four loans were treated as a single loan on the bank's books. The principal ground of the decision was that the three loans were "never used to purchase or carry margin stocks," and that the "actual purpose" was controlling:

"[T]he regulation itself states that the purpose of a credit is determined by substance rather than form. 12 C.F.R. § 221.3(b). Since these credits were admittedly *never used to purchase or carry margin stocks,* and could not have contributed to the evils which the statute and the regulation were designed to control (see discussion *infra*), it would exalt form over

substance to allow the bank's internal bookkeeping procedure to prevail over the court's characterization based on *actual purpose.*" 506 F.2d 1377. (Emphasis added)

The opinion in *Tartell v. Chelsea National Bank, supra,* dictates even closer scrutiny of the actual use of each portion of the proceeds of a single loan. In that case, plaintiff claimed that an entire $40,000 loan violated Regulation U, even though only $21,000 had actually been used to repay indebtedness for the purchase of securities. The court stated that plaintiff had "improperly aggregated the purpose and non-purpose portions of the $40,000 loan," and held that only the $21,000 portion was subject to Regulation U. 351 F.Supp. at 1076.

Considering the actual use by J. S. Love of the proceeds of each of the three loans in the present case separately, Fowler's testimony that J. S. Love used the first loan to "build up balances" for an underwriting of Capital National Bank stock is undisputed, and if this is true, the proceeds clearly were used to purchase or carry margin stock. The problem as to this loan is the *quality* of the proof. Neither Fowler nor Stonehill has produced cancelled checks showing payment of the proceeds to J. S. Love[32] or any records of J. S. Love tracing these funds or showing the expenditure of funds to purchase Capital National Bank shares in connection with the underwriting. This kind of proof is clearly superior to Fowler's recollections in depositions taken three years after the fact. Without it, the court cannot ensure that *all* of the proceeds were used for the same purpose, as required by *Tartell, supra;* moreover, the failure to

31. Security contends that § 221.103 is inapplicable because the loan was a loan to Fowler, not to J. S. Love, the brokerage firm. I reject this view. The case of Cooper v. Union Bank *supra*; the administrative interpretation in 32 F.R.B. 995, apparently a predecessor to § 221.103; and the interpretive letter submitted as Plaintiff's Exhibit 33

adopt the view that a loan is not deprived of its character as a purpose loan simply because it is made indirectly through the medium of a principal of the brokerage firm.

32. There is, in fact, little or no dispute that the proceeds of all three loans were transferred to J. S. Love.

produce it or to explain why it was not produced may give rise to an inference that it would have been unfavorable to Fowler and Stonehill, *Tupman Thurlow Co., Inc. v. S. S. Cap Castillo,* 490 F.2d 302 (2d Cir. 1974); *Menendez v. Saks & Co.,* 485 F.2d 1355 (2d Cir. 1973), *cert. granted sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba,* 416 U.S. 981, 94 S.Ct. 2382, 40 L.Ed.2d 758 (1974), and preclude a grant of summary judgment.

All of the factors just mentioned also preclude me · from granting summary judgment to Stonehill and Fowler as to the April 23 loan. Moreover, Fowler did not testify expressly that the proceeds of *this* loan were actually used for the purpose of taking down J. S. Love's share of the Capital National Bank underwriting. Although such actual use might be inferred *at trial* from Fowler's testimony that he *intended* so to use the funds, *Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), Fowler and Stonehill are not entitled to such an inference on their motions for summary judgment. *Bender v. New Zealand Bank & Trust (Bahamas), Ltd., supra,* 67 F.R.D. at 640.

As to the third loan, Fowler's testimony that J. S. Love used the proceeds for "working capital" is undisputed; but for the reasons stated in connection with the first loan, the court must have books and records of J. S. Love showing the precise application of the funds. Furthermore, although two of the administrative authorities (32 F.R.B. 995; Plaintiff's Exhibit 33) indicate that proceeds used by a brokerage house for "working capital" will be deemed to be used to purchase or carry margin stock, I am of the view that at most there is an inference to this effect which cannot operate in favor of the movants on summary judgment.

On the basis of the foregoing, Fowler and Stonehill's motions will be denied without prejudice to their renewal upon presentation of the kind of proof which I have indicated is necessary. With such a renewal in view, I will make a' ruling on the remaining issues on these motions. Security's motion must be denied insofar as it is· grounded on Regulation U and no purpose would be served by its renewal.

█ I reject Security's contention that the loans were exempted by 12 C. F.R. § 221.2(m), which exempts certain loans to a "customer for the purpose of making a loan or contribution of capital to a broker or dealer subject to [Regulation T]." That exemption became effective April 16, 1971, after all three loans in issue were extended; since there is no clear indication of an intent that this exemption be applied retroactively, ·it will not be applied in this case. *Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *see Freeman v. Marine Midland Bank of New York, supra,* 494 F.2d at 1337 n. 4 (refusal to apply § 7(f) of Exchange Act and Regulation X retroactively); *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 274 F.2d 608 (2d Cir.), *cert. denied,* 363 U.S. 811, 80 S.Ct. 1247, 4 L.Ed.2d 1153 (1960).

█ Turning to the third issue in regard to purpose, a lending bank will be held liable only if it is established that the bank had actual knowledge of the violation of Regulation U or was negligent in failing to discover it—that is, if it knew or in the exercise of reasonable care should have known of the violation. *Serzysko v. Chase Manhattan Bank, supra,* 290 F.Supp. at 83; *Tartell v. Chelsea National Bank, supra,* 351 F. Supp. at 1077. In *Serzysko,* the plaintiff borrower, a registered representative working for a brokerage firm, was informed by the bank that it was unwilling to make a purpose loan, whereupon he told the bank that he would use the proceeds only to purchase bonds which were not within the coverage of Regulation U. At least three of six Form U–1

purpose statements signed by plaintiff for his six loans expressly stated that the loans were *not* purpose loans. The court held that the bank would be liable if it knew or should have known of the violation:

> "Where the proceeds of loans made by a bank are used by the borrower for the purpose of purchasing or carrying registered securities the fact the lender · has no actual knowledge of such use does not completely answer the question as to whether Regulation U has been violated. Regulation U would be violated if the lender *in the exercise of reasonable diligence should have known* that the proceeds were being so used." 290 F.Supp. at 83. (Emphasis added)

Although the court found after trial that none of the bank's officers had actual knowledge, and that they had been misled by the misrepresentations of the borrower, whose integrity they had no reason to doubt, certain facts put them on notice that the loans were actually purpose loans. Specifically, on several occasions, the bank was directed to pay the proceeds directly to plaintiff's brokerage firm against delivery of securities by the broker for collateral.[33]

In the present case, Royal and Security could not claim to have been *deceived* by the Form U–1 statements since the U–1 Forms stated the true purpose of the loans, as far as they went. Moreover, Bacher admits, at least in respect of the January 21 and April 14 loans, that Fowler, unlike plaintiffs in *Serzysko* and *Tartell*, did not state that the loans would *not* be used to purchase or carry margin stocks.

In addition, Bacher had considerable background knowledge of J. S. Love's business and Fowler's position in the company. In respect of the January 21

loan, he knew that Fowler would make an "investment" in J. S. Love and that J. S. Love was an underwriter for Display Sciences.

I find that with respect to the April 23, 1970, loan, the statements in the U–1 Form and the facts as admitted by Bacher were sufficient to place Royal on notice. As to the U–1 Form, the administrative interpretations stress the need for investigation where statements in the U–1 Form indicate the likelihood that the loan is a purpose credit. *See* 39 F.R.B. 950–51 (1953); 33 F.R.B. 27 (1947). Moreover, 12 C.F.R. § 221.103 states that where the loan is made to a brokerage firm, the U–1 Form must call for answers which indicate clearly whether the loan is a purpose loan or the bank may not rely on the statement, and, implicitly, must make an investigation. Here Bacher admitted that despite the April 23, 1970, U–1 Form which stated that the proceeds were to be lent to a brokerage house, the bank made no independent investigation. Moreover, although Bacher disputed Fowler's testimony that he was specifically informed that the loans were to be used for the Capital National Bank offering, Bacher admitted that he knew that J. S. Love was the underwriter for that offering, and he must have known that the underwriting occurred almost simultaneously with the loan.[34] Summary judgment is rarely granted in favor of a party attempting to establish negligence or lack of reasonable care. *See, e. g., In re Alva M/T Cape*, 405 F.2d 962 (2d Cir. 1969). However, the undisputed facts so clearly establish that Royal was on notice with respect to the April 23 loan and failed to discharge the duty to investigate imposed on it by regulation, that the issue of reasonable care may be resolved against Security on summary

---

33. In *Tartell, supra*, the bank was also misled by misstatements of the plaintiff but was similarly placed on notice by circumstances surrounding the loan.

34. As noted, Bacher's wife purchased 100–200 shares.

judgment. *See Baroff v. Becker*, 197 F.Supp. 9 (E.D.N.Y.1961).

With respect to the loans of April 14, 1970, and March 15, 1971, the evidence thus far presented does not justify summary judgment on the issue of reasonable care. The deposition testimony as to conversations between Bacher and Fowler regarding the purpose of the April 14 loan is in conflict. Bacher acknowledged that he knew certain facts about the Capital National Bank underwriting. But he did not testify that Royal made no independent investigation in respect of the April 14 loan, and Stonehill and Fowler are not entitled to an inference to this effect on summary judgment.

As to the loan of March 15, 1971, the deposition testimony does not reveal any facts which would put Royal on notice as to the purpose of this credit nor does it show whether Royal made an independent investigation. The March 15 Form U–1 statement and Bacher's background knowledge of J. S. Love's business do not provide a sufficient basis for summary judgment as to this loan.

*Knowledge on Part of Fowler and/or Stonehill; In Pari Delicto*

Security contends that even if there was a violation of Regulation U, Fowler and Stonehill should be denied recovery and should be barred, wholly in part, from asserting Regulation U as a defense because they are sophisticated borrowers who knew of the alleged violations and deceived the bank as to the purposes of the loans.

*Fowler*

I agree with Fowler that the undisputed facts in this case do *not* show that Fowler deliberately deceived Royal by misrepresenting the purpose of the

loans, as did plaintiff in *Serzysko v. Chase Manhattan Bank, supra; Goldman v. Bank of Commonwealth, supra;* and *Tartell v. Chelsea National Bank, supra.*

Indeed the U–1 Forms and Fowler's statements to Bacher, as admitted by Bacher,. stated the true purpose of the loans as far as they went. Thus even if the other issues on this motion were resolved in Security's favor, Security would not be entitled to summary judgment on this issue.

By the same token, Fowler's admitted familiarity with Regulation U, and Bacher's testimony as to Fowler's statements to him raise genuine issues of material fact as to whether Fowler knew of the violations and deliberately withheld complete information as to the purposes of the loans. These questions involving Fowler's state of mind are not appropriately resolved on summary judgment, *Empire Electronics Co. v. United States*, 311 F.2d 175, 179–80 (2d Cir. 1962) ; *see Serzysko v. The Chase Manhattan Bank, supra*, CCH Fed.Sec. L.Rep. ¶ 91,676 at 95,481, at least on the basis of the record before me.[35]

*Stonehill*

It is substantially undisputed that Stonehill was aware at the time he lent the Jeanette shares to Fowler that Fowler would use the shares as collateral for a bank loan.[36] Fowler and Stonehill did not discuss Regulation U at any time. (Stonehill Tr. 49 ; Fowler Tr. 69).

There may be some dispute as to what Fowler told Stonehill in respect of the purpose of the loan. Fowler testified that he told Stonehill that the Jeanette securities were to be used as collateral for a loan to increase J. S. Love's capital and enable it to participate in

---

35. Fowler will be free to file proof on this issue should be choose to renew his motion.

36. Stonehill's deposition states that Fowler did not initially tell him that the shares

would be used as collateral for a bank loan (Stonehill Tr. 20, 33) ; but the allegations of Stonehill's amended complaint, which are to the contrary, are surely admissions in this regard.

underwritings. (Fowler Tr. 32, 33). In respect of the April 23 loan, he testified generally that he told Stonehill the purpose (Fowler Tr. 69), which was to underwrite the offering of Capital National Bank stock. Stonehill testified that Fowler told him that:

> " * * * he wanted to expand the business of J. S. Love, that they were establishing a house purchasing account and needed capital, to be able to buy stocks and that they originally needed the stocks to have on deposit so that they could broaden the scope of their business." (Stonehill Tr. 15–16).

Stonehill recalled that in connection with the second loan of stock, Fowler mentioned that the Jeanette shares were to be used in connection with the Display Sciences underwriting. (Stonehill Tr. 20).

It is apparently not disputed that neither Bacher nor any other Royal officer had any communication, written or oral, with Stonehill. Nor is it disputed that in 1970, Stonehill received no notice as to the status of any loans or as to the fact that he had specifically guaranteed any loan from Royal to Fowler, nor any notice that the January 21, 1970, loan had been repaid or that Mrs. Fowler was co-guarantor of the loans. (Stonehill Tr. 46–48; Bacher Tr. 77).

It appears clear that Stonehill was "kept in the dark" as to the timing and amount of the loans to Fowler, and that

he did not know that the loans exceeded the maximum loan value of the collateral. Nonetheless, the undisputed facts show that he knew certain facts as to the purposes of the loans, and summary judgment on the issue of Stonehill's knowledge of the violations is inappropriate at this time.[37] *Empire Electronics Co. v. United States, supra.*

*State Law Claims and Defenses*

In its memorandum, Security argues that the second count of Stonehill's amended complaint alleges no facts in support of its claim that Royal knew or should have known of the alleged fraud whereby Fowler allegedly obtained Stonehill's Jeanette stock. Although Security might have moved to dismiss under Rule 12(b)(6), *see* Rule 12(h)(2), F.R.Civ.P., 5 Wright and Miller, *supra,* § 1361, or for judgment on the pleadings; *see* Rule 12 (h)(2), even though it has answered,[38] it has not so moved explicitly.[39] Since Security has introduced "matters outside the pleadings," it is appropriate to consider this a motion for summary judgment,[40] *see* Rules 12(b), (c); and so considered, it is not supported by such affidavits or other sworn statements as would require Stonehill to "set forth specific facts [by affidavit or otherwise] showing that there is a genuine issue for trial," *see* Rule 56(c),[41] to avoid an adverse adjudication. Accordingly, Security's motion is denied with respect to this issue.

---

37. I have found that a guarantor has a right of action under Regulation U, and it seems to follow that he has a responsibility not to induce, and perhaps to try to prevent a violation. Whether this responsibility is commensurate with that imposed by Serzysko, *supra,* and Goldman, *supra,* on the borrower is an issue that the parties may brief if they choose to renew this motion.

38. If this argument should be deemed to be addressed to the sufficiency of Count 2 under Rule 9(b), the time limits applicable to a Rule 12(b) motion, as set forth in Rule 12(h) may be applied by analogy. 5 Wright and Miller, *supra,* § 1394 at 869.

39. Since Security did not designate this to be a 12(b)(6) motion, Stonehill's reply papers do not address it as such, and it would be unfair to treat it as such.

40. It is immaterial whether the summary judgment motion is deemed to be addressed directly to Count 2 of the amended complaint or to Security's defense of failure to state a claim in its answer.

41. Security would have difficulty in establishing that Count 2 is defective under Rule 9(b) in view of the second sentence of that Rule. 5 Wright and Miller, *supra,* § 1297 at 404.

Security also contends that Stonehill's defense of estoppel to Security's counterclaim is without merit. Insofar as the estoppel defense is based on Royal's failure to give notice of the existence of other guarantors, the defense is insufficient since notice is not required in any event, and I construe the provisions of the guarantee allowing Royal to "modify" Fowler's indebtedness without notice to Stonehill to relieve Royal of any notice obligation it might otherwise have had. Insofar as the estoppel theory is based on the alleged violation of Regulation U, the validity of the defense depends on resolution of the Regulation U issue.

Stonehill's defenses of improper execution and lack of consideration raise issues of fact which may not properly be resolved on the record before me.

A determination of Fowler's or Stonehill's right to damages and to return of the Jeanette stock must await resolution of the underlying question of the parties' respective liabilities. The issue of whether Royal and Security were holders in due course under UCC § 8–302 will also be considered at that time.

*Summary*

In summary, I hold that Stonehill, as guarantor, has a right of action under Regulation U, and has standing to assert a violation thereof.

However, the motions of all parties for summary judgment are denied, except that Security is entitled to judgment that Stonehill's defense of lack of notice of a co-guarantor is without mer-it. The denial of Stonehill and Fowler's motions alone is without prejudice to their renewal solely for the purpose of presenting the following additional evidence:

(1) Proof of the actual use of the proceeds of all three loans in issue by J. S. Love, preferably in the form of cancelled checks and records of J. S. Love. In this regard, if the proof shows that only a portion of each loan was a purpose loan, the parties should brief the issue of the proper allocation of the collateral between the purpose and non-purpose portions.[42]

(2) Proof on the issues of whether Royal was on notice of the purposes of the April 14, 1970, and March 15, 1971, loans and whether Royal made an independent investigation in respect of these loans.

(3) Proof on the issue of whether Fowler knew that any one or all of the loans violated Regulation U.

(4) Evidence of whether Stonehill knew that the loans were purpose loans, and if so, whether he knew that they exceeded the maximum loan value of the collateral.

Determination of all questions going to the respective remedies of the parties must await resolution of the issues of liability.

Pursuant to Rule 56(d), F.R.Civ.P., the facts designated herein as undisputed or substantially undisputed shall be deemed established upon the trial of this action. Within 30 days, the parties shall settle an order setting forth such facts.

---

**42.** In Tartell v. Chelsea National Bank, *supra*, the court, without expressly considering the point, allocated *all* of the $80,000 in collateral to the purpose portion of the $40,000 loan. The applicable maximum loan value was 30%, and the court held that there was no violation if less than $24,000 of a $40,000 loan was shown to be purpose credit. 12 C.F.R. § 221.1(d), states that "all the collateral securing [the purpose] credit" shall be considered in determining whether" there is a violation, providing possible support for this view. To the contrary, see 12 C.F.R. § 221.3(n), suggesting that the collateral must be apportioned between the purpose and non-purpose portions; and *see* Daley v. Capitol Bank and Trust Co., *supra*, and Friedman v. Belgian-American Banking Corp., *supra*, where the courts indicated that collateral should be allocated *pro rata* between purpose and non-purpose credits.

Within ten days the parties may also agree upon a schedule for renewal of this motion and submission of the evidence specified above, all papers to be filed within sixty days of this opinion.[43]

Settle order.

43. The court recognizes that cross-examination upon deposition will probably be necessary to proper exploration of the state of mind of Fowler and Stonehill. The schedule filed within 10 days should indicate the dates of all depositions, if any.