

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-16-2001

# GFL Advantage Fund v. Colkitt

Precedential or Non-Precedential:

Docket 00-2428

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"GFL Advantage Fund v. Colkitt" (2001). *2001 Decisions.* Paper 265.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/265

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 16, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2428

GFL ADVANTAGE FUND, LTD.,
a British Virgin Islands Corporation,

v.

DOUGLAS R. COLKITT

Douglas Colkitt
        Appellant

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(No. 4:CV-97-0526)
District Judge: Honorable James F. McClure, Jr.

Argued October 9, 2001

Before: SCIRICA, GREENBERG and COWEN,
Circuit Judges

(Filed: November 16, 2001)

        Peter S. Russ (argued)
        Gregory J. Krock
        Buchanan Ingersoll
        One Oxford Centre, 20th Floor
        301 Grant Street
        Pittsburgh, PA 15219-1410

         Attorneys for Appellee

Peter Konolige
Marcy L. Colkitt & Associates, P.C.
983 The Woods, Suite 618
Old Eagle School Road
Wayne, PA 19087

James P. Kimmel, Jr. (argued)
P.O. Box 1139
Kennett Square, PA 19348

 Attorneys for Appellant

OPINION OF THE COURT

GREENBERG, Circuit Judge:

This matter comes on before this court on defendant Douglas R. Colkitt's appeal from the district court's order for summary judgment in favor of plaintiff GFL Advantage Fund, Ltd. against Colkitt entered on April 25, 2000, and on appeal from an order entered on July 17, 2000, denying reconsideration of the April 25 order. For the reasons stated herein, we will affirm the orders of the district court.

I. BACKGROUND

A. FACTUAL HISTORY

Douglas Colkitt, who earned both his medical degree and MBA from the University of Pennsylvania in 1979, is the founder and majority shareholder of two small capitalization medical services businesses -- EquiMed, Inc. ("EquiMed") and National Medical Financial Services Corporation ("National Medical"). As of February 1996, Colkitt held 20,783,633 (73%) of EquiMed's 28,589,717 outstanding shares of common stock, and as of May 1996, he owned 2.8 million (38%) of National Medical's 7,426,844 outstanding shares of common stock. See GFL Advantage Fund, Ltd. v. Colkitt, No. 4:CV-97-0526, Memorandum and Order at 4 (M.D. Pa. July 17, 2000).

Beginning in 1996, Colkitt sought financing to pursue various business ventures unrelated to EquiMed and

2

National Medical. After unsuccessfully attempting to secure financing from traditional commercial lending institutions, Colkitt contacted alternative lenders that might be willing to structure "convertible or exchange transactions," whereby Colkitt would be able immediately to convert his vast stockholdings into cash. In particular, Colkitt endeavored to borrow money by pledging his common stock as collateral and providing the lender with the right to convert or exchange the debt for the shares pledged by Colkitt.

In the spring of 1996, Colkitt's broker identified GFL Advantage Fund, Ltd. ("GFL") as a possible lender, and on May 24, 1996, Colkitt obtained a loan of $3,000,000 from GFL. Under the terms of the note ("National Medical note"), GFL had the right after 30 days of the date of the note to exchange up to $1.5 million of its outstanding principal for shares of National Medical stock held by Colkitt at an exchange rate of 82% of the average market price. GFL could exchange the remainder of the unpaid balance for shares of National Medical 60 days after the date of the note. The average market price was computed by taking the average of the stock's closing prices for the five days immediately prior to the exchange request. In essence, the note gave GFL the right to require Colkitt to repay the loan with National Medical stock valued at a discount of 18% of the five-day average closing price, thus giving GFL an immediate paper profit as it would receive stock with a premium value to repay a debt of a lesser amount.

Several months later on August 5, 1996, Colkitt entered into a similar transaction with GFL for a $10,000,000 loan. The structure of the second note ("EquiMed note") was akin to that of the National Medical note, except the parties agreed that GFL could convert the debt into shares of Colkitt's other business, EquiMed, Inc., at an exchange rate of 83% of the average market price. In addition, GFL could convert up to $5 million of the outstanding principal after 60 days of the date of the note and could convert the balance of the principal 30 days thereafter.

Nearly four months after issuing the initial $3,000,000 loan to Colkitt, GFL made its first of six exchange demands for National Medical stock. On September 13, 1996, GFL

exchanged $250,000 of debt for 34,130 shares of National Medical stock at the average market price of $9.20 and an exchange or conversion price of $7.32. On September 19, 1996, GFL exchanged $135,000 of loan principal for 18,726 shares at an average market price of $9.075 and a conversion price of $7.21. On October 10, 1996, GFL converted $257,000 of debt into 47,081 shares at an average closing price of $6.925 and a conversion price of $5.46. On December 5, 1996, GFL exchanged $100,000 of unpaid principal for 14,845 shares at an average market price of $8.725 and an exchange price of $6.74. On December 19, 1996, GFL converted $200,000 of debt into 34,588 shares at an average market price of $7.525 and a conversion price of $5.78. Finally, on January 7, 1997, GFL demanded an exchange of $545,000 of loan principal for 100,223 shares, but the request was withdrawn after Colkitt dishonored GFL's earlier exchange demand for EquiMed stock.

GFL waited until November 1996, more than 3 months after the date of the EquiMed note, before making its first exchange demand for EquiMed shares. On November 27, 1996, GFL demanded that Colkitt convert $560,000 in outstanding principal into EquiMed stock. With a five-day average closing price of $4.50, GFL received 150,555 shares of EquiMed at an exchange rate price of $3.72. GFL's next exchange demand for EquiMed stock occurred on January 3, 1997, when GFL sought to convert $1,430,000 in unpaid principal, but Colkitt dishonored the request.

Unknown to Colkitt at the time, and on the same day in September 1996 as GFL's first exchange demand for National Medical stock, GFL began short selling National Medical stock. As we have explained:

> Short selling is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest . . . . The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares . . . . Herein lies the short seller's potential for profit: if the price of stock declines after the short sale, he does not need all the funds to make this covering purchase; the short

4

seller then pockets the difference. On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to a stock's price, there is no limitation on the short seller's risk.

Zlotnick v. Tie Communications, 836 F.2d 818, 820 (3d Cir. 1988). See also 17 C.F.R. S 240.3b-3 (defining short sale as "any sale of a security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller"); Black's Law Dictionary 1339 (7th ed. 1999) (defining short sale as the "sale of a security that the seller does not own or has not contracted for at the time of sale, and that the seller must borrow to make delivery"). In other words, short sellers are betting that the stock price will decline between the time they sell the borrowed stock and the time they must "cover," i.e., purchase replacement shares to repay the borrowed stock. Short selling, which is closely regulated, see, e.g., 17 C.F.R. S 240.10a-1, is a legitimate trading strategy for stocks that traders believe are overvalued.

GFL's first short sale of National Medical stock occurred on September 13, 1996, when it sold 32,500 shares at a price of $10.00 per share. On September 16, 1996, GFL sold short 15,000 shares of National Medical at $9.13 per share. On September 17, 1996, GFL sold short 5,000 shares at $9.25 per share. On October 11, 1996, GFL sold short 3,000 shares at $8.25 per share. Finally, on October 14, 1996, GFL sold short 7,000 shares of National Medical at $8.25 per share. GFL sold short a total of 62,500 shares of National Medical stock over a one-month period.

GFL also sold EquiMed shares short. On November 8, 1996, GFL sold short a total of 18,400 shares of EquiMed -- 10,000 shares at $5.50 per share and 8,400 shares at $5.48 per share. On November 11, 1996, GFL sold short 32,500 shares at $5.38 per share. On November 12, 1996, GFL sold short 16,000 shares at $5.25 per share. On November 14, 1996, GFL sold short 8,500 shares at $5.25 per share. Finally, on November 22, 1996, GFL sold short 3,300 shares of EquiMed stock at $5.00 per share. Over this two-week period in November 1996, GFL sold short a total of 78,700 shares of EquiMed stock.

GFL explains that it engaged in short sales of National Medical and EquiMed stock as a hedging strategy against "delivery risk." Under the terms of the notes, the exchange price was based on the average closing price during the five trading days preceding the exchange request. Consequently, the exchange price was locked in on the date of the exchange request, thus shifting onto GFL the risk that the stock's price would drop more than the 17% or 18% discount. In other words, "if the stock price dropped more than the agreed-upon discount before GFL was able to sell the exchanged shares, GFL would be in a loss position." Br. of Appellee at 7. GFL claims it sold short to protect itself in the event that the price of the stock declined further after GFL made the exchange request but before GFL was able to sell the shares.

The theory of Colkitt's case, however, is that GFL sold National Medical and EquiMed shares short in an effort to depress the prices of the stocks. Indeed, Colkitt contends that the market price of National Medical dropped 17.5% between GFL's first and last short sales of National Medical stock, and that the market price of EquiMed declined by 18.5% between GFL's first short sale of EquiMed stock and GFL's first exchange demand.[1] Colkitt argues that GFL purposely depressed the stock prices so that Colkitt would be forced to exchange more shares to retire the same amount of debt. He asserts that GFL was able to obtain an additional 27,882 shares of EquiMed and an additional 11,658 shares of National Medical due to the respective declines in the stocks' prices.

_____

1. Inexplicably, Colkitt measures the price decline of EquiMed stock during the period between GFL's first short sale on November 8, 1996, and GFL's first exchange demand on November 27, 1996, rather than between GFL's first short sale on November 8, 1996, and its last short sale on November 22, 1996. As GFL points out, however, if the price decline of EquiMed stock is measured during the period between GFL's first and last short sales, EquiMed's price drop would be approximately 2%. See Br. of Appellee at 36. More specifically, the price of EquiMed on the day of the first short trade on November 8 was $5.25 per share, whereas the price on the day of the last short sale on November 22 was $5.13. See id. at 36 n.13. This $.12 drop represents only a 2.3% decrease.

6

As noted above, Colkitt refused to honor GFL's exchange request for EquiMed shares on January 3, 1997. Instead, Colkitt notified GFL in December 1996 and early January 1997 that he intended to prepay all unpaid principal and interest in cash. Colkitt contends that GFL improperly rejected his request to prepay the unpaid balance, even though the notes contemplated such prepayment. GFL responds that it did not reject outright Colkitt's offer to prepay, but rather refused to allow Colkitt to dictate the terms of any prepayment and disagreed with Colkitt about the amounts due. GFL admits that it does not believe that Colkitt had a right to prepay, but insists that it "accepted Colkitt's offer to prepay whatever amount Colkitt believed was then due, reserving for itself the right to contest the disputed balance." Br. of Appellee at 13. GFL claims that Colkitt neither responded to its overtures nor attempted to prepay or pay any amounts to GFL.

B. PROCEDURAL HISTORY

On April 4, 1997, GFL filed a complaint against Colkitt alleging breach of his obligations on the National Medical and EquiMed notes. On June 6, 1997, Colkitt filed an answer, affirmative defenses, and six counterclaims. The affirmative defenses and counterclaims alleged, inter alia, that GFL engaged in securities fraud and market manipulation in violation of various federal and state securities laws by temporarily depressing the prices of National Medical and EquiMed stock through its concentrated short sales. Colkitt claimed that GFL engaged in the scheme so that it could exchange debt for shares at an artificially low price and earn enormous windfall profits when prices returned to their normal levels. On March 31, 1998, the district court adopted a magistrate judge's recommendations that Colkitt's counterclaims be dismissed. The district court dismissed one counterclaim with prejudice and the balance without prejudice. 2 On April

_____

2. The Court dismissed counterclaims I (Section 10(b) of the Security Exchange Act of 1934 and Rule 10b–5 under the Act), III (Section 29 of the Securities Exchange Act of 1934), IV (Pennsylvania Securities Act), and V (common law fraud) without prejudice for lack of specificity. The court dismissed counterclaim II (Section 17 of the Securities Act of 1933)

20, 1998, Colkitt filed amended counterclaims in an effort to cure the deficiencies of the original counterclaims, but on February 2, 1999, the district court again dismissed Colkitt's inadequately pled counterclaims without prejudice for lack of specificity.

On April 25, 2000, the district court granted summary judgment in favor of GFL based largely on the reasoning of In re Olympia Brewing Co. Securities Litigation , 613 F. Supp. 1286 (N.D. Ill. 1985). The court concluded that, because short selling is not an unlawful trading practice, it would not draw the inference that GFL manipulated the market price of EquiMed and National Medical stocks simply because GFL engaged in substantial short selling of the stocks. The court also determined that Colkitt failed to present evidence that GFL's short sales had an appreciable effect on the prices of the stocks. Finally, the court concluded that even if the short sales did depress prices, Colkitt failed to show that "the declines in price are attributable to false information injected into the market by the short sales and not to information otherwise available to the market." GFL Advantage Fund, Ltd. v. Colkitt, No. 4:CV-97-0526, Memorandum and Order at 22 (M.D. Pa. Apr. 25, 2000).

On July 17, 2000, the district court denied Colkitt's motion for reconsideration and entered final judgment in favor of GFL. The court clarified its earlier ruling on GFL's motion for summary judgment, explaining that the evidence of GFL's short sales alone was insufficient to establish Colkitt's claims of securities fraud and market manipulation because selling stocks short is lawful. The court declared that "[t]here must be some circumstances beyond the mere occurrence of short sales to suggest that

_____

with prejudice, subject to reinstatement in the event that we recognize a private right of action under Section 17 of the Securities Act of 1933, 15 U.S.C. S 77q(a). The court dismissed counterclaim count VI (unjust enrichment) without prejudice because the equitable remedy of unjust enrichment is not available when a contract exists between the parties. Although the court initially dismissed count VI with prejudice, the court concluded on reconsideration that the order was in error and changed the dismissal to a dismissal without prejudice.

8

the short sales were part of a scheme to manipulate the market," which Colkitt failed to proffer. GFL Advantage Fund, Ltd. v. Colkitt, No. 4:CV-97-0526, Memorandum and Order at 14 (M.D. Pa. July 17, 2000). The court then proceeded to reject Colkitt's argument that numerous inferences that he believed should be drawn from the factual record created genuine issues of material fact that precluded summary judgment. The court refused to accept any of Colkitt's proffered inferences -- each of which Colkitt has raised on appeal -- and reaffirmed its decision that GFL was entitled to summary judgment as a matter of law.

II. JURISDICTION AND STANDARD OF REVIEW

A. JURISDICTION

The district court had subject matter jurisdiction over GFL's breach of contract action pursuant to 28 U.S.C. S 1332 based upon diversity of the parties and the amount in controversy. The district court entered final judgment in this case on July 17, 2000, and appellant filed a timely notice of appeal on August 15, 2000. Therefore, we have jurisdiction pursuant to 28 U.S.C. S 1291. 3

_____

3. As noted above, the district court twice dismissed certain of Colkitt's counterclaims without prejudice for lack of specificity. In some circumstances, such a dismissal could deprive us of appellate jurisdiction as "ordinarily we do not have jurisdiction under 28 U.S.C. S 1291 of an appeal from an order partially adjudicating a case when an appellant has asserted a claim in district court which it has withdrawn or dismissed without prejudice." Erie County Retirees Ass'n v. County of Erie, 220 F.3d 193, 201 (3d Cir. 2000). Our case law, however, allows us to exercise appellate jurisdiction under 28 U.S.C.S 1291 when the district court has divested itself of the case entirely. See id. at 202. Here, although the district court's orders dismissed Colkitt's counterclaims without prejudice, the court's summary judgment order effectively barred Colkitt from re-filing them, for the court concluded that Colkitt's affirmative defenses -- which were identical to his counterclaims -- failed as a matter of law. Consequently, the court's order granting summary judgment in favor of GFL terminated the suit so far as the court was concerned. See Trent v. Dial Med. of Fla., Inc., 33 F.3d 217, 220 (3d Cir. 1994) ("Even dismissals without prejudice have been held to be final and appealable if they `end [ ] [the] suit so far as the District Court was concerned . . . .' ") (citation omitted). Therefore, we have jurisdiction over this appeal.

9

## B. STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo and apply the same standard as the district court applied in the first instance. See Lucent Info. Mgmt., Inc. v. Lucent Tech., Inc., 186 F.3d 311, 315 (3d Cir. 1999). We may affirm summary judgment in favor of GFL only if, after drawing all reasonable inferences from the record in the light most favorable to Colkitt, "there is no genuine issue as to any material fact" and GFL is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As the nonmoving party, Colkitt must create a genuine issue of material fact by presenting sufficient evidence to permit a jury to find in his favor. See Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). To defeat summary judgment, he "cannot rest simply on the allegations in the pleadings," but "must rely on affidavits, depositions, answers to interrogatories, or admissions on file." Bhatla v. U.S. Capital Corp., 990 F.2d 780, 787 (3d Cir. 1993). Therefore, it will be appropriate to affirm summary judgment for GFL if we conclude that there is insufficient evidence for a reasonable jury to return a verdict for Colkitt.

## III. DISCUSSION

## A. RESCISSION OF THE NOTES PURSUANT TO SECTION 29

Colkitt contends that the National Medical and EquiMed notes are unenforceable by reason of Section 29 of the Securities Exchange Act of 1934 ("Exchange Act") because GFL violated the anti-fraud provisions under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Section 29(b) provides in relevant part that:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, . .. [or] the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void.

15 U.S.C. S 78cc(b) (emphasis added). Colkitt argues that GFL violated Section 10(b) and Rule 10b-5 when it engaged

10

in market manipulation by short selling National Medical and EquiMed stock in an effort to depress the share prices, and when it engaged in fraudulent deception by concealing its plan to short sell National Medical and EquiMed stock. See Br. of Appellant at 24. Colkitt asserts that the notes are void and unenforceable under Section 29(b) because the notes were "made in violation of" Section 10(b) and Rule 10b-5 insofar as (1) they were part of GFL's scheme to manipulate the market prices of National Medical and EquiMed stock and (2) they contain omissions of material fact about GFL's short selling strategy. See Reply Br. of Appellant at 19.

GFL argues that Colkitt's Section 29(b) affirmative defense fails for two reasons. First, Section 29(b) is a remedial provision that is triggered only when another section of the Exchange Act has been violated. As addressed below, GFL maintains that it did not engage in either market manipulation or securities fraud in violation of Section 10(b), and therefore, there is no underlying offense to trigger Section 29(b). See infra pp. 17-36. Second, GFL contends that Colkitt fails to state a proper Section 29(b) defense inasmuch as Colkitt alleges that it is GFL's short selling, not the National Medical and EquiMed notes, that is unlawful. GFL argues that only "unlawful contracts," not "unlawful transactions" executed pursuant to lawful contracts, may be rescinded under Section 29(b).

We deal with GFL's second contention first, which is supported by the limited body of case law on the point. For instance, in Slomiak v. Bear Stearns & Co., 597 F. Supp. 676, 677 (S.D.N.Y. 1984), plaintiff opened a margin account and a repurchase account with defendant Bear Stearns. He purchased millions of dollars of government bonds in his margin account -- less than 10% with cash and the remainder with loans by Bear Stearns. See id. When plaintiff was notified of a margin call on his account and failed to muster the $155,000 in additional margin demanded, Bear Stearns liquidated the government bonds in plaintiff's account. See id. Plaintiff alleged that Bear Stearns violated Section 10(b) and Rule 10b-16 by failing to provide him at the time he opened his accounts with a written statement explaining the terms under which Bear

11

Stearns would extend him credit. See id. Based on these alleged violations, plaintiff sought to rescind all of his bond transactions pursuant to Section 29(b). See id.  at 681. The court concluded that plaintiff could not rescind the transactions, explaining:

> The complaint alleges that Bear Stearns failed to send plaintiff a written credit disclosure statement in violation of Rule 10b-16 at the time he opened his accounts; it does not allege that the customer agreements establishing his margin and repurchase accounts at Bear Stearns were themselves unlawful . . . . `[U]nder S 29 of the Exchange Act, only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts.'

Id. at 681-82 (quoting Zerman v. Jacobs , 510 F. Supp. 132, 135 (S.D.N.Y. 1981), aff'd, 672 F.2d 901 (2d Cir. 1981) (table)). Because Bear Stearns's alleged violation of Rule 10b-16 was "clearly collateral to the contract agreement governing the account," the court determined that the firm's failure to provide the written statement to plaintiff did "not justify rescission of the account agreement itself or the transactions undertaken pursuant to that agreement." Id. at 682-83.

In Drasner v. Thomson McKinnon Securities, Inc. , 433 F. Supp. 485, 488-89 (S.D.N.Y. 1977), plaintiffs maintained margin accounts with defendant Thomson McKinnon Securities between 1973 and 1975. Plaintiffs began selling naked options in 1974 and profited handsomely off the transactions until 1975, when the market began spiking upward. See id. Between January and May 1975, plaintiffs incurred substantial losses on their options until Thomson McKinnon finally closed their accounts and liquidated their collateral. See id. at 489. Plaintiffs sought to rescind the options contracts pursuant to Section 29(b) because Thomson McKinnon allegedly violated Regulation T by failing to direct plaintiffs to deposit the required amount of initial margin in their accounts. See id. The court rejected plaintiffs' claim, stating that Section 29(b) "only renders void those contracts which by their terms violate the Act or the rules and regulations thereunder . . . for it is only such contracts which are `made in violation of,' or`the

12

performance of which involves the violation of' the statute and the rules and regulations thereunder." Id. at 501–02. The court explained that even if Thomson McKinnon had violated Regulation T, Section 29(b) was inapplicable because the options contracts that plaintiffs sought to rescind were governed by a valid, lawful contract whose terms did not violate the Exchange Act or any regulations promulgated thereunder. See id. at 502.

Colkitt responds to GFL's argument by citing Regional Properties, Inc. v. Financial and Real Estate Consulting Co., 678 F.2d 552, 560 (5th Cir. 1982), which challenges Drasner's narrow construction of Section 29(b). In Regional Properties, two real estate entrepreneurs brought suit against their broker and his firm, Financial and Real Estate Consulting Co. ("Financial"), alleging that the broker had violated Section 15(a)(1) of the Exchange Act by selling limited partnership interests for them without having registered with the SEC as a broker–dealer. See id. at 556. The entrepreneurs and their affiliated corporations sought to rescind their agreements with Financial pursuant to Section 29(b) in light of the broker's violations of Section 15(a)(1). See id. The court rejected Drasner's conclusion that Section 29(b) renders void only those contracts that "by their terms" violate the Exchange Act and instead interpreted Section 29(b) as "render[ing] voidable those contracts that are either illegal when made or as in fact performed." Id. at 560. The court concluded that rescission was proper because, although plaintiffs sought to avoid contracts that were "perfectly lawful on their face," the performance of the contracts by Financial nevertheless "resulted in a violation of the Act." Id. at 561. The court added: "That these contracts, under different circumstances, could have been performed without violating the Act is immaterial." Id.

Although the court of appeals in Regional Properties rescinded the contracts therein and explicitly rejected Drasner's narrow reading of Section 29(b), its opinion is nevertheless consistent with the outcomes in Drasner, Slomiak, and Zerman. In particular, the violations of the Exchange Act alleged in Drasner, Slomiak , and Zerman were "collateral or tangential to the contract between the

13

parties," whereas the violation alleged in Regional Properties was "inseparable from the performance of the contract" that plaintiffs were attempting to void. Slomiak, 597 F. Supp. at 682. The parties could -- and did -- perform the contracts at issue in Drasner, Slomiak, and Zerman without committing any violations of the Exchange Act, but the broker in Regional Properties could not carry out his obligations under the agreements without violating the Exchange Act, for performance of the agreements entailed selling partnership interests, which the broker lawfully could not do due to his failure to register as a broker-dealer.

The other two cases cited by Colkitt are also consistent with this analysis. In both cases, the courts voided loan agreements because the banks violated Regulation U, which governs the amount of money that a bank can lend for the purchase of registered securities. In Grove v. First National Bank of Herminie, 489 F.2d 512, 513 (3d Cir. 1974) (per curiam), bank employees failed to explain to plaintiff that under federal law, the bank "could lend only a certain percentage of the market value of stock to purchase registered securities." Concluding that the bank had violated Regulation U, we held that Section 29(b) precluded the bank from recovering a deficiency, "even if the borrower knowingly and intentionally deceives the bank as to the actual purposes of the loans." Id. at 516.

In Stonehill v. Security National Bank, 68 F.R.D. 24, 28 (S.D.N.Y. 1975), a bank sought to recover the outstanding balance on a loan, but the borrower claimed that the loan was void and unenforceable because the bank issued the loan in violation of Regulation U. The bank argued that even if the borrower's obligations were void due to the bank's alleged violation of Regulation U, it still could recover from the guarantor. See id. at 33. The court disagreed, holding that "if the principal obligation violates Regulation U, a guarantee of that obligation is void under S 29(b) of the Exchange Act." Id. The court explained that "allow[ing] a bank to recover on a guarantee even though the underlying loan violated Regulation U would encourage banks to extend credit in violation of the margin requirements." Id. at 34.

14

As with the violation of Section 15(a)(1) in Regional Properties, the violations of Regulation U in Grove and Stonehill were inseparable from the underlying agreements between the parties: the banks could not perform their obligations under the loan agreements (i.e., lend money to the borrowers so that they could purchase securities) without violating Regulation U. In fact, the loans were "made in violation of" the Exchange Act because a greater percentage of the loans was used to purchase securities than is allowed under Regulation U.

The same cannot be said for GFL's obligations under the National Medical and EquiMed notes in this case. GFL's allegedly unlawful short sales of National Medical and EquiMed stock were nothing more than "collateral or tangential" to the notes. Colkitt insists that performance of the contracts "involves a violation of" securities laws because "performance itself (exchange of shares and repayment of the loan plus interest) . . . supports GFL's illegal short selling by giving GFL shares with which to cover the short sales." Br. of Appellant at 25 n.8. Despite the theory of Colkitt's case, however, GFL's short sales are completely independent of the parties' respective obligations under the terms of the notes -- namely, GFL's obligation to lend Colkitt a total of $13,000,000, and Colkitt's obligation to repay the loans at GFL's option with shares of National Medical and EquiMed stock. In the end, GFL's alleged unlawful activity (i.e., its short sales) is too attenuated from the parties' valid, lawful contracts (i.e., the National Medical and EquiMed notes) or GFL's performance thereunder. Therefore, we conclude that the notes were neither made nor performed in violation of any federal securities laws as is required for rescission under Section 29(b). 4

B. MARKET MANIPULATION

Colkitt argues that the district court erred in rejecting his affirmative defense that the notes are void pursuant to Section 29(b) due to GFL's alleged market manipulation, as

_____

4. Notwithstanding our conclusions as to the scope of Section 29(b), we will discuss the market manipulation and securities fraud issues as our conclusions on them are critical to our disposition of Colkitt's appeal from the dismissal of his counterclaims. See supra note 3.

15

there exist genuine issues of material fact regarding whether GFL's short sales constituted market manipulation in violation of Section 10(b) and Rule 10b-5. GFL argues, however, that Colkitt has not presented enough evidence to create triable issues on any of the elements of market manipulation.5

_____

5. GFL also insists that Colkitt cannot obtain reversal of summary judgment with respect to GFL's alleged manipulation of National Medical's price because Colkitt abandoned his market manipulation and securities fraud claims with respect to National Medical by conceding that GFL's short sales of National Medical stock did not violate any securities laws. See Br. of Appellee at 19-21. To support its contention, GFL quotes a passage from Colkitt's opposition to GFL's motion for summary judgment, which states that "[t]he short selling of National Medical presents an interesting contrast to the short selling of EquiMed." Id. at 20 (quoting Colkitt's Brief in Opposition to Summary Judgment at 6 (App. 000837)). GFL claims that this statement, along with other unspecified passages in Colkitt's opposition and his motion for reconsideration, led the district court to limit its rulings to only the EquiMed note.

GFL's argument is without merit. A review of the district court's April 25, 2000 Memorandum reveals that the court addressed Colkitt's market manipulation and securities fraud claims as to both EquiMed and National Medical. Indeed, National Medical is mentioned throughout the district court's summary judgment and reconsideration rulings. There is no indication in the district court's rulings that Colkitt abandoned these claims or that the court limited its rulings to only the EquiMed note.

GFL also distorts the meaning of the above-quoted passage by taking it out of context. When Colkitt admitted that the short sales of National Medical differed in some respects to the short sales of EquiMed, he was referring only to GFL's contention that it engaged in the short sales as a hedging strategy. As will be explained in more detail below, see infra pp. 28-30, Colkitt's expert maintains that selling short prior to the five-day period before the exchange demand is not a legitimate hedging strategy, but instead an attempt to profit from declining stock prices. The expert insists that if GFL were only trying to hedge against a possible drop in price after the exchange demand (so-called "delivery risk"), GFL could have eliminated that risk by selling short during the five-day period before the exchange demand -- in essence, locking in the sale price during the same period the average closing price would be calculated. Colkitt's statement was simply an "acknowledgment that, unlike the EquiMed shorts, the National Medical shorts, by their timing, could at least qualify as a hedge strategy" because they were made

16

1. Elements of Market Manipulation Under Section 10(b)
and Rule 10b-5

As an initial matter, the parties disagree about the specific
elements of market manipulation under Section 10(b) and
Rule 10b-5. To complicate matters further, we seemed not
to have addressed squarely what elements are required to
establish a claim of market manipulation, particularly in
the context of a Section 29(b) affirmative defense, and the
case law from other courts of appeals and district courts on
this issue provides limited guidance. Section 10(b) states in
relevant part that "[i]t shall be unlawful for any person
. . . [t]o use or employ, in connection with the purchase or
sale of any security . . ., any manipulative or deceptive
device or contrivance in contravention of such rules and
regulations" promulgated by the SEC. 15 U.S.C.S 78j. Rule
10b-5 provides in relevant part that "[i]t shall be unlawful
for any person . . . [t]o employ any device, scheme, or
artifice to defraud." 17 C.F.R. S 240.10b-5.

Noting that Section 10(b) outlaws but does not define a
"manipulative or deceptive device or contrivance," Colkitt
turns to Section 9(a) of the Exchange Act to determine the
elements of the offense of market manipulation. Section
9(a) prohibits individuals from effecting "a series of
transactions in any security registered on a national
securities exchange . . . creating actual or apparent active
trading in such security, or raising or depressing the price
of such security, for the purpose of inducing the purchase
or sale of such security by others." 15 U.S.C.S 78i(a)(2).
Based on this passage and the Supreme Court's decision in
Aaron v. SEC, 446 U.S. 680, 695, 100 S.Ct. 1945, 1955
(1980), in which the Court recognized scienter as an
element of a Section 10(b) claim, Colkitt maintains that
summary judgment was improper because he created
genuine issues with respect to each of the following
_____

within the days immediately preceding GFL's exchange demands for
National Medical stock. Reply Br. of Appellant at 5. This narrow
admission cannot be construed as a complete waiver of his
counterclaims and affirmative defenses with respect to the National
Medical note.

elements of market manipulation: (1) GFL engaged in a series of transactions in the registered securities; (2) the purpose of GFL's short sales was to induce others to sell the securities; (3) GFL's short sales created "actual or apparent active trading" in the securities or depressed the prices of the securities; and (4) GFL acted with scienter.

GFL responds that Colkitt has mischaracterized the elements of market manipulation by applying an overly broad description of prohibited activities set forth under Section 9(a) and by ignoring the specific requirements of market manipulation that have evolved over time. GFL points out that market manipulation is "virtually a term of art when used in connection with the securities market. It connotes intentional and willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199, 96 S.Ct. 1375, 1384 (1976). GFL asserts that Colkitt disregards two necessary elements of a market manipulation claim -- that "GFL injected inaccurate information into the marketplace" and that GFL's conduct "affected the price" of National Medical and EquiMed stock. Br. of Appellee at 24.

The first disputed element is whether Colkitt must demonstrate that GFL injected inaccurate information into the marketplace or created a false impression of market activity. Like the district court, GFL relies on Olympia Brewing, 613 F. Supp. at 1292, in which the district court emphasized that the "essential element" of a market manipulation claim is the injection of "inaccurate information" into the market. GFL observes that even the cases cited by Colkitt "recognize that market manipulation requires an additional element, something beyond otherwise legal trading, which specifically injects false information into the market and/or creates an artificial demand for the underlying security." Br. of Appellee at 22 (emphasis added). Colkitt responds, however, that he is not required to present evidence that "GFL injected affirmative misinformation into the market," but only needs to demonstrate that "GFL's short trades were made for the undisclosed purpose of artificially depressing share prices." Reply Br. of Appellant at 9 (emphasis added).

18

Notwithstanding Colkitt's assertion to the contrary, the parties appear to be in accord on this point. Indeed, the difference between their positions seems to be one without distinction. Both GFL and Colkitt focus on the need to demonstrate that some action was taken to artificially depress or inflate prices, whether by purposely making false statements or by employing illegitimate, deceptive trading techniques that mislead investors about the price or demand for a stock.

To the extent that the parties' respective positions are at odds, however, GFL advances a sounder construction of a Section 10(b) market manipulation claim, for it is less vague than Colkitt's. The Supreme Court has indicated that market manipulation "generally refers to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." Santa Fe Indus. v. Green, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302 (1977). "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." Gurary v. Winehouse, 190 F.3d 37, 45 (2d Cir. 1999). In that vein, courts must distinguish between legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and deceive purchasers and sellers. Although Colkitt's construction properly reflects the aspiration of Section 10(b) of preventing market activities that artificially depress prices, it provides little guidance on which activities artificially affect prices and which activities legitimately impact prices.

Requiring a Section 10(b) plaintiff to establish that the alleged manipulator injected "inaccurate information" into the market or created a false impression of market activity cures this problem. Such a construction permits courts to differentiate between legitimate trading activities that permissibly may influence prices, such as short sales, and "ingenious devices that might be used to manipulate securities prices," Santa Fe Indus., 462 U.S. at 477, 97 S. Ct. at 1303, such as wash sales and matched orders. As the court in Olympia Brewing, 613 F. Supp. at 1292,

19

stated, "[r]egardless of whether market manipulation is achieved through deceptive trading activities or deceptive statements as to the issuing corporation's value, it is clear that the essential element of the claim is that inaccurate information is being injected into the marketplace."

The second disputed element is whether Colkitt must establish that GFL's allegedly manipulative conduct actually depressed the prices of National Medical and EquiMed stock. GFL argues that market manipulation in violation of Section 10(b) and Rule 10b-5 requires that the allegedly unlawful conduct impact a security's price. GFL cites three cases to support its position, but all three are unhelpful. First, although we stated in Rosenberg v. Hano, 121 F.2d 818, 821 (3d Cir. 1941) (footnote omitted), that "the party claiming injury must plead and prove some change in price, because of the prohibited acts," the case involved an alleged violation of Section 9, not Section 10(b) and Rule 10b-5. Second, the opinion in United States v. Russo, 74 F.3d 1383, 1394 (2d Cir. 1996), is not significant here because it only addressed the propriety of the portion of the district court's jury instruction on the scienter element that defined artificial price as the price level above the stock's actual value as determined by market forces. Third, the decision in In re Blech Securities Litigation, 928 F. Supp. 1279, 1298 (S.D.N.Y. 1996) (citation omitted), directly contradicts GFL's position by stating that"[t]he absence of allegations of market dominance and price movement are not fatal to" a claim of market manipulation, for although "these may be classic attributes of market manipulation, they are not requisites."

Colkitt's position is somewhat inconsistent on this point. On the one hand, he takes great pains to argue that GFL's short sales depressed the price of National Medical by 17.5% and the price of EquiMed by 18.5%. On the other hand, when confronted with evidence that the prices of the stocks were on a sharp downward trend before and after GFL's short sales, thus raising serious doubts about the true reason for the declining prices, Colkitt reverses course and argues that he need not prove that GFL's alleged scheme was successful in depressing prices. Colkitt insists that he only must establish that GFL attempted to depress

20

prices by selling shares short. To muddy the waters even more, Colkitt appears to make a concession that an impact on price must be established when he states in his reply brief: "A jury must also decide whether GFL's short trades had an affect [sic] on share prices." Reply Br. of Appellant at 11.

Despite his flip-flopping on the issue, Colkitt appears to be correct that he need not prove that GFL's manipulative conduct actually depressed prices. The Court of Appeals for the Fifth Circuit concluded in Chemetron Corp. v. Business Funds, Inc., 718 F.2d 725, 728 (5th Cir. 1983), that Section 10(b), unlike Section 9(a), does not require that a plaintiff prove the allegedly unlawful activities had an effect on the price of the stock. Although any damages that Colkitt would be entitled to recover under his Section 10(b) and Rule 10b-5 counterclaim would be contingent on proving that GFL's conduct actually depressed prices, proof of price movement is not necessary to establish a violation of Section 10(b) and Rule 10b-5 and therefore is not necessary to support his assertion of an affirmative defense under Section 29(b).6

_____

6. Although maintaining a private right of action under Section 10(b) requires a plaintiff to prove reliance and damages (usually reflected in the stock's price movement), Section 29(b) only requires a violation of Section 10(b), not the maintenance of a private suit under Section 10(b). Therefore, looking to the statutory language of the anti-fraud provision, we note that an individual violates Section 10(b)-- and therefore triggers Section 29(b) -- when he or she employs manipulative or deceptive devices in connection with the purchase or sale of securities. This situation is analogous to a government prosecution under Section 10(b), in which the government is not required to meet the normal standing requirements imposed on those asserting a private remedy, inasmuch as the government need not demonstrate that the defendant's conduct induced reliance by investors or affected the price of the security. See, e.g., United States v. Haddy, 134 F.3d 542, 549 (3d Cir. 1998) (holding that reliance is not an element of the crime of stock manipulation).

Even if we were to embrace the position of GFL and the district court that proof of an effect on price is necessary to establish a claim of market manipulation, the district court still erred in concluding that Colkitt failed to create a genuine issue of material fact with respect to price movement. As already noted, Colkitt claims that the price of

21

We are satisfied that, at bottom, neither party properly articulates the elements of market manipulation under Section 10(b) in the context of a Section 29(b) affirmative defense. Because we have not squarely addressed this issue, we must set forth the necessary elements for such a claim. In this regard, we conclude that to establish a Section 29(b) affirmative defense of market manipulation in violation of Section 10(b) and Rule 10b-5, Colkitt must present evidence that (1) in connection with the purchase or sale of securities, (2) GFL engaged in deceptive or manipulative conduct by injecting inaccurate information into the marketplace or creating a false impression of supply and demand for the security (3) for the purpose of artificially depressing or inflating the price of the security.

2. Evidence Supporting Colkitt's Claim of Market Manipulation

Colkitt's affirmative defense based upon GFL's alleged market manipulation fails because he cannot demonstrate

_____

National Medical dropped 17.5% and the price of EquiMed plummeted 18.5% during the period of GFL's short sales. The district court concluded, however, that these statistics are "not evidence that the value of the shares was affected by the short sales: the free fall began before the short sales and continued well after the short sales." GFL Advantage Fund, Ltd. v. Colkitt, No. 4:CV-97-0526, Memorandum and Order at 21 (M.D. Pa. July 17, 2000). The district court observed that the price of EquiMed declined steadily from $15.00 on February 1, 1996, to $2.4583 on January 2, 1998, including a dramatic drop of 27.6%, from $7.25 to $5.25, during the 24-day period immediately preceding GFL's short sales. See id. at 20-21. The court also noted that National Medical plummeted from $12.875 on May 1, 1996, to $0.4375 on January 2, 1998. See GFL Advantage, Ltd. v. Colkitt, No. 4:CV-97-0526, Memorandum and Order at 18 (M.D. Pa. Apr. 25, 2000). Based on these long-term, downward trends in the stocks' prices, the district court concluded that Colkitt could not prove that GFL's short sales had an effect on the price of either National Medical or EquiMed stock. Although the court was correct that other factors clearly were contributing to the slide in prices, it was not within the court's province to weigh the evidence as a finder of fact. Whether and how much GFL's alleged unlawful conduct contributed to the downturn in prices would have been issues for the jury if Colkitt's case had survived GFL's motion for summary judgment. Contrary to the district court's conclusion, Colkitt clearly created genuine issues as to whether GFL's short sales affected the prices of National Medical and EquiMed.

22

that GFL engaged in any deceptive or manipulative conduct by injecting false inaccurate information into the marketplace or creating a false impression of supply and demand for the stock. As the district court explained repeatedly in its two rulings, Colkitt has not presented any evidence that GFL did anything but lawfully engage in short sales of National Medical and EquiMed stock. The fact that these short sales may have contributed to a decline in the stocks' prices is not evidence of deceptive or manipulative conduct, for there is no reason to believe these prices were depressed artificially. See Sullivan & Long, Inc. v. Scattered Corp., 47 F.3d 857, 864 (7th Cir. 1995) (concluding that defendant's "unprecedented massive short selling" did not create "a false impression of supply and demand" because on the other side of defendant's transactions were"real buyers, betting against [defendant], however foolishly, that the price of [the] stock would rise"); Olympia Brewing, 613 F. Supp. at 1296 (stating that "short selling is simply not unlawful, even in large numbers and even if the trading does negatively affect the purchase price"). Indeed, the district court stated it well when it wrote that it is unreasonable "to infer unlawful intent from lawful activity alone." GFL Advantage Fund, Ltd. v. Colkitt , No. 4:CV–97–0526, Memorandum and Order at 19 (M.D. Pa. July 17, 2000).

In the cases Colkitt cites in which courts concluded that a party's short selling was part of a scheme to manipulate stock prices, the short selling was in conjunction with some other deceptive practice that either injected inaccurate information into the market or otherwise artificially affected the price of the stock. See Russo, 74 F.3d at 1387, 1390, 1391 (defendants used short sales in concert with "unauthorized placements" and "parking" of stock in customers' accounts to generate false credits that funded their "stock–kiting scheme" designed to artificially inflate stock prices); United States v. Regan, 937 F.2d 823, 829 (2d Cir. 1991) (defendants sought to depress temporarily the price of stock by arranging to have 40,000 shares sold short secretly to a broker–dealer without disclosing to the dealer the identity of the seller or the moving party behind the deal); United States v. Charnay, 537 F.2d 341, 344 (9th Cir. 1976) (to facilitate a take–over bid, defendants

23

artificially depressed stock prices by getting others to sell 86,100 shares short and "guaranteeing these sellers by secret understanding a recovery of $22 per share irrespective of the price obtained on the Exchange"); Advanced Magnetics, Inc. v. Bayfront Partners, Inc. , No. 92 Civ. 6879 (CSH), 1996 WL 14440 (S.D.N.Y. Jan. 16, 1996) (defendant attempted to depress stock prices through short sales that contravened Section 10(a) of the Exchange Act and Rule 10a-1 thereunder, which prohibits a short sale "below the price at which the last sale" of the security was reported), vacated in part on other grounds, 106 F.3d 11 (2d Cir. 1997).

The remaining cases of market manipulation Colkitt cites likewise involved either injection of inaccurate information into the market or creation of a false impression of supply and demand for a stock. See Santa Fe Indus., 430 U.S. at 467, 97 S.Ct. at 1298 (defendant obtained "fraudulent appraisal" of stock that severely undervalued its worth "in order to lull the minority stockholders into erroneously believing that [its cash-exchange offer] was generous"); Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 792-93 (2d Cir. 1969) (in an effort to inflate prices and thwart a corporate take-over, defendant "painted the tape" by purchasing large blocks of stock in the open market at inflated prices while simultaneously making large secret and unreported sales at lower prices to partially finance the purchases); Blech, 928 F. Supp. at 1286, 1298 (defendant arranged "sham transactions" to inflate prices by improperly directing trades into and out of brokerage accounts at the firm without the authorization of the owners of the accounts); SEC v. Kimmes, 799 F. Supp. 852, 856-57 (N.D. Ill. 1992) (defendant maintained artificially high stock prices by buying and selling stock through "undisclosed nominee accounts," distributing"false and misleading registration statements," and filing"false and materially misleading period reports" with the SEC), aff'd sub nom., SEC v. Quinn, 997 F.2d 287 (7th Cir. 1993); SEC v. Malenfant, 784 F. Supp. 141, 144-45 (S.D.N.Y. 1992) (defendant arranged "matched buy and sell orders" to "create a misleading appearance of active trading in the Texscan common stock" and thus drive up the price of the

24

stock). Once again, Colkitt fails to proffer any evidence that GFL engaged in any such inappropriate conduct.

Colkitt attempts to overcome this dearth of evidence of deceptive or manipulative conduct on the part of GFL by claiming that short sales, by their very nature,"convey to market participants negative information about the prospects of the firm." Br. of Appellant at 39. Colkitt's argument misses the mark, however, because conveying negative information about a firm does not constitute market manipulation unless the information is untruthful. Indeed, legitimate short sales often convey negative information about a company insofar as short sales suggest that a stock's price is overvalued, but that does not mean that such sales distort the market. To the contrary, short selling can help move an overvalued stock's market price toward its true value, thus creating a more efficient marketplace in which stock prices reflect all available relevant information about the stock's economic value. See Sullivan & Long, 47 F.3d at 861-62.

Colkitt maintains that National Medical and EquiMed were not overvalued. He insists that, because GFL did not argue before the district court that it sold short because it believed the stocks were overvalued, Colkitt is entitled to the inference that "the short sales were made at least in part to convey to the market the false impression that the stocks were overvalued so as to result in a decline in share prices." Br. of Appellant at 40 (emphasis in original). It would not be reasonable to draw such an inference, however, for to do so would fly in the face of uncontradicted evidence that the prices of National Medical and EquiMed were on a dramatic slide before and after GFL's short sales. If we were to draw any inference from the record evidence about the value of National Medical and EquiMed, it would be that the market considered the stocks to be overvalued and that GFL simply was responding to market forces, rather than distorting them, by engaging in short sales.

An examination of Colkitt's other requested inferences,7
_____

7. The parties disagree about the standard of review that should be applied to Colkitt's requested inferences. GFL contends that the standard

25

see Br. of Appellant at 30–35, exposes Colkitt's claims for what they are -- nothing more than a general attack on the lawful practice of short selling. For instance, Colkitt's first two inferences -- that GFL had a "unique financial incentive" to depress the prices of National Medical and EquiMed because its profits increased as the market prices decreased,8 and that short selling "conveys negative information" about the company being short sold and contributes to a drop in share prices -- are general criticisms of short selling. These inferences, even if granted, are of no help to Colkitt in trying to prove market manipulation, inasmuch as short selling is a lawful investment strategy. Colkitt's next three requested inferences -- that GFL's short sales constituted a large percentage of shares sold on a daily basis, that GFL's short

_____

is abuse of discretion because Colkitt raised these inferences for the first time when it filed its motion for reconsideration. Colkitt maintains that the standard is plenary because he raised all of the evidence and advanced all of the arguments at earlier stages in the litigation. This point is moot, however, because we would uphold the district court's rulings with respect to the inferences under either standard.

8. Colkitt believes that GFL's incentive to depress prices is "unique" because the structure of the convertible notes allows GFL to receive more shares -- and thus higher profits -- as the stocks' prices decline. This incentive, however, is not unique to GFL's situation. All short sellers receive higher profits as the stock's price declines. Indeed, these higher profits in the face of declining prices are why traders engage in short sales. They are betting that the stock's price will decline, and if it does so, they will have to spend less money buying replacement stock to cover the borrowed shares, thus allowing them to pocket the difference.

Colkitt's differentiation between GFL and other short sellers based on the structure of the National Medical and EquiMed notes is misguided. Whether GFL acquires $100,000 worth of shares from Colkitt in exchange for debt (as GFL did here) or in exchange for cash (as short sellers normally do when they cover) is irrelevant. In either situation, GFL will be able to obtain more shares from Colkitt if prices decline. Thus, if this "unique" incentive to depress prices is evidence that GFL engaged in market manipulation, then all short traders are likewise guilty of manipulating markets in violation of Section 10(b). Of course, this position is untenable, for as already explained, short selling is perfectly lawful.

26

sales caused a 17.5% decline in National Medical and an 18.5% decline in EquiMed,9 and that these price slumps allowed GFL to obtain an additional 11,658 shares of National Medical and an additional 27,882 shares of EquiMed from Colkitt -- are equally unavailing. Once again, short selling, even in large volumes, is not in and of itself unlawful and therefore cannot be regarded as evidence of market manipulation. That short selling may depress share prices, which in turn may enable traders to acquire more shares for less cash (or in this case, for less debt), is not evidence of unlawful market manipulation, for they simply are natural consequences of a lawful and carefully regulated trading practice.10

Colkitt's remaining inferences are equally groundless. Because a court is required to indulge only reasonable inferences, we reject Colkitt's last three requested inferences. For instance, Colkitt insists that GFL's use of four different brokers to execute the short trades is evidence that GFL tried to conceal its short sales from market participants, including Colkitt. This inference is unreasonable as GFL needed to use four brokers because none of them had enough shares necessary for GFL to

_____

9. As already noted, see supra note 1, Colkitt greatly exaggerates EquiMed's price decline. The price of EquiMed on the day of the GFL's first short sale on November 8, 1996, was $5.25 per share, and its price on the day of GFL's last short sale on November 22, 1996, was $5.13. Consequently, the price of EquiMed dipped only $.12, or 2.3%.

10. A passage in Colkitt's reply brief further undermines his theory that short sales are manipulative because they depress prices. He writes: "It is reasonable and makes economic sense to infer that short selling drives down share prices, because each short sale is, itself, a `sale,' increasing
supply . . . ." Reply Br. of Appellant at 15 (emphasis added). In other words, Colkitt believes that short sales are manipulative because they increase the stock's supply and drive down its price. This, of course, is true (assuming demand remains constant), but it is also true for all stock sales, whether they are from long positions or short positions. The rationale of Colkitt's theory would lead to the absurd result of outlawing any sales practice that increases a security's supply and consequently may affect its price. Colkitt fails to understand that increasing the supply of stocks by selling them on the open market in legitimate transactions to real buyers does not artificially affect prices and therefore
cannot be manipulative.

borrow to carry out all of its short sales, which is not unusual when dealing with small cap stocks. See Br. of Appellee at 39 (citing Cason Aff. P 13 (App. 001080)).

Colkitt's next requested inference relates to GFL's assertion that it sold National Medical and EquiMed short to hedge against the stocks' declining prices and to lock in the notes' 17.5% and 18.5% profit spreads. Colkitt offers expert testimony that GFL's short sales could not have been part of a legitimate hedging strategy because too much time elapsed between the short sales and the exchange demands. The expert avers that if GFL were only trying to protect itself against declining prices after it made its exchange demand, it could have eliminated that "delivery risk" by selling short during the five-day period before the exchange demand, thus locking in the sale price during the same period the average closing price would be determined. Because GFL waited so long after the short sales to make its exchange demands, the expert contends GFL was not simply hedging against slumping prices, but was "increas[ing] the likelihood of increasing profits through artificially (and temporarily) lowering the price of EquiMed."[11] Br. of Appellant at 16-17 (quoting Expert Report of Professor Steven R. Grenadier P 20. (App. 000860-000861)).

Accepting as true Grenadier's position that GFL could have hedged against all risk by selling short during the five-days prior to the exchange demands, a court reasonably could infer that GFL not only sought to protect itself, but also endeavored to reap further profit from the stocks' declining prices by selling short. To infer that these "premature" short sales were executed to manipulate prices, however, would be an unreasonable leap. Indeed, Grenadier admits in his deposition that he does not have an opinion about whether GFL's short sales artificially depressed the prices of EquiMed stock. See Grenadier Dep. at 37 (App. 001016). Therefore, although it may be reasonable to infer from Grenadier's report that GFL's short

_____

11. Grenadier mentions only EquiMed because GFL sold National Medical short during the five-day period prior to its exchange demands to the stock. Therefore, even under Grenadier's theory, GFL's short trades of National Medical qualify as a legitimate hedging strategy.

28

sales were intended not only to hedge against declining prices but to profit from them, it would be unreasonable to infer that GFL's short sales were deceptive or manipulative, especially considering that the expert concedes that he does know whether the trades had the effect of manipulating the prices.[12]

Finally, in the words of the district court, Colkitt's last requested inference amounts to "baseless and desperate mudslinging." Colkitt asserts that GFL was sued twice "for engaging in manipulative short selling" thus evidencing that it engaged in that type of conduct with regard National Medical and EquiMed stock. Br. of Appellant at 35. GFL responds that it was not even involved in Global Intellicom, Inc. v. Thomson Kernaghan & Co., No. 99-CIV-342, 1999 WL 544708 (S.D.N.Y. July 27, 1999). Instead, the case involved a former employee whose allegedly unlawful conduct occurred after he left GFL. GFL also asserts that the action in JTS Corp. v. GFL Advantage Fund, Ltd. was dismissed in the early stages of the litigation after it filed for Rule 11 sanctions against the plaintiff. Based on GFL's averments, it would be entirely inappropriate to grant Colkitt's requested inference that these two lawsuits are evidence of GFL's alleged market manipulation in this case.

At bottom, the core of Colkitt's argument is premised on his belief that short selling artificially depresses prices and presumably should be banned as a market manipulation. Unfortunately for Colkitt, however, short selling is lawful, and courts have held that short selling, even in massive volume, is neither deceptive nor manipulative when carried out in accordance with SEC rules and regulations. See

_____

12. Other portions of Grenadier's report also appear to undermine such a conclusion. In particular, Grenadier endorses the conclusions of Harvard Business School's Paul Asquith and Lisa Meulbroek that short trading would have an impact on the value of the securities if the number of shares sold short constituted 2.5% or more of the total outstanding shares. See Grenadier Dep. at 80-81 (App. 001017-001018). In this case, GFL sold short a total of 78,700 shares of EquiMed, which constituted only .275% of EquiMed's 28,589,717 outstanding shares. Therefore, under the standard embraced by Colkitt's own expert, GFL's short sales of EquiMed stock would not be expected to have a noticeable impact on the stock's price.

29

Sullivan & Long, 47 F.3d at 864-65. Therefore, to make out a claim of market manipulation, Colkitt must present evidence that GFL engaged in some other type of deceptive behavior in conjunction with its short selling that either injected inaccurate information into the marketplace or created artificial demand for the securities. Colkitt has offered nothing but evidence that GFL engaged in lawful short sales of National Medical and EquiMed, which alone is insufficient to prevail on a claim of market manipulation in violation of Section 10(b) and Rule 10b-5.

Another reason why Colkitt's market manipulation claim fails is because he has not met the scienter requirement by offering evidence that GFL engaged in short sales for the purpose of artificially depressing the prices of National Medical and EquiMed stock. Citing our opinion in In re Advanta Corp. Securities Litigation, 180 F.3d 525, 535 (3d Cir. 1999), Colkitt argues that he has met the recklessness standard for liability under Section 10(b). He contends that GFL's conduct constitutes "an extreme departure from the standards of ordinary care" and "presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. (internal quotation marks omitted). According to Colkitt, evidence of GFL's alleged recklessness includes: GFL's "powerful economic incentive" to depress the stocks' prices; "voluminous scholarly evidence" that GFL's short sales would convey a "negative impression" of the companies; the dramatic drop in the stocks' prices during the period of GFL's short selling; the additional 39,540 shares that GFL "extracted" from Colkitt because of the declining prices; GFL's use of four brokers to conceal his short sales; the conclusion of Colkitt's expert that GFL's short sales were not part of a legitimate hedging strategy; and GFL's having been sued twice for similar conduct.

In essence, Colkitt recycles his arguments that he advanced in support of his contention that GFL's short trades were manipulative and deceptive. Some of this evidence and the requested inferences to be taken therefrom already have been discredited -- GFL's use of multiple brokers, whether GFL's short sales were a legitimate hedge strategy, and the alleged lawsuits against

30

GFL for engaging in short selling -- and the rest of the evidence and inferences are, once again, general attacks on the practice of selling short -- the powerful incentive to depress prices, the negative impression of the company conveyed by short sales, the actual drop in National Medical and EquiMed prices, and the additional shares GFL obtained because of the declining prices. All that this information proves is that GFL engaged in the lawful practice of selling stock short and that these short sales may or may not have affected the price of National Medical and EquiMed stock. This evidence neither establishes that GFL's short sales were manipulative nor demonstrates that GFL executed the trades for the purpose of depressing the stocks' prices. Perhaps, if Colkitt had offered evidence that GFL's short sales violated SEC rules (for instance, if GFL failed to cover properly the short sales in violation of Rule 10a-2, or if GFL made short sales below the last sales price in violation of Rule 10a-1), Colkitt might have been able to establish that GFL's conduct was intentionally or recklessly manipulative or deceptive. In the absence of evidence that GFL engaged in any wrongful conduct, however, Colkitt's claim of market manipulation must fail. Therefore, we will affirm summary judgment in favor of GFL with respect to the market manipulation claim.

C. SECURITIES FRAUD

Colkitt also claims that the notes should be voided pursuant to Section 29(b) on the grounds that GFL committed securities fraud in violation of Section 10(b) and Rule 10b-5 when it failed to disclose its intent to manipulate the prices of National Medical and EquiMed stock through short sales. GFL responds that it had no duty to disclose its intent to engage in short sales and that Colkitt has not established that he either relied on this alleged omission of fact or suffered a cognizable injury as a result of the reliance.

1. Elements of Securities Fraud Under Section 10(b) and Rule 10b-5

It is well settled that a claim of securities fraud under Section 10(b) requires proof "that the defendant (1) made misstatements or omissions of material fact; (2) with

31

scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Weiner v. Quaker Oats Co., 129 F.3d 310, 315 (3d Cir. 1997) (citation and internal quotations omitted). The parties apparently agree that the third element has been established, as there is no dispute that the alleged fraud was related to the purchase or sale of National Medical and EquiMed securities. Therefore, Colkitt must establish genuine issues with respect to the following elements: omissions of material fact, reliance, cognizable injury, and scienter.13

2. Evidence Supporting Colkitt's Claim of Securities Fraud

Colkitt asserts that GFL concealed from him two critical pieces of information that constitute omissions of material fact: (1) GFL's intention to sell short National Medical and EquiMed stock; and (2) GFL's actual short sales of the stock. Colkitt maintains that GFL had an affirmative duty to disclose this information because it was material and he would not have entered into the contracts with GFL if he had known it planned to sell the stocks short.

Analysis of a securities fraud claim under Section 10(b) and Rule 10b-5 includes two steps: "First, was the defendant under a duty to disclose at the time at issue? Second, was the alleged omission or misstatement material? If, under the facts of this case, no duty to disclose exists, or if the undisclosed facts are not material, there is no liability under Rule 10b-5." Staffin v. Greenberg, 672 F.2d 1196, 1202 (3d Cir. 1982). A duty to disclose arises only when one party to a transaction has material information that the other party is entitled to have because of some relationship of trust and confidence between the parties, such as when one party is a fiduciary, corporate insider, or "tippee." See Chiarella v. United States, 445 U.S. 222, 229, 100 S.Ct. 1108, 1115 (1980). The Supreme Court has determined that "[a]n omission of fact is material if

_____

13. Colkitt submits the same evidence of scienter in support of both his securities fraud claim and his market manipulation claim. See supra pp. 30-31.

32

there is a substantial likelihood that a reasonable shareholder would consider it important in deciding" whether to invest. Basic, Inc. v. Levinson, 485 U.S. 224, 231, 108 S.Ct. 978, 983 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132 (1976)). Materiality is a mixed question of law and fact and should be decided as a matter of law "[o]nly when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ." In re Craftmatic Sec. Litig., 890 F.2d 628, 641 (3d Cir. 1990).

Colkitt's securities fraud claim falters for at least one and possibly two reasons. To start with, he failed to present any evidence that GFL intended to engage in short sales at the time it loaned the money to Colkitt. See In re Phillips Petroleum Secs. Litig., 881 F.2d 1236, 1245 (3d Cir. 1989) (stating that "a statement of intent need only be true when made; a subsequent change of intention will not, by itself, give rise to a cause of action under Section 10(b) or Rule 10b–5"). More significantly, even if we can draw an inference that GFL had such a plan, it did not have a duty to disclose its intentions.

Colkitt argues that GFL had a duty to disclose its intentions because such a disclosure was necessary to clarify GFL's "implicit" representations that the debt-for-stock exchange price would be "based upon the accurate, unbiased and untainted market price quoted by the stock market." Br. of Appellant at 48. Colkitt explains that Section 10(b) and Rule 10b–5 impose a "duty to disclose any material facts that are necessary to make disclosed material statements, whether mandatory or volunteered, not misleading." Craftmatic, 890 F.2d at 641. He asserts that GFL's implicit guarantee that the exchange price would be based upon prevailing market forces "was rendered grossly misleading by GFL's failure to disclose that it intended to short sell EquiMed and National Medical." Br. of Appellant at 48–49.

We must reject Colkitt's argument for it is premised on the misguided notion that short sales distort markets and thus produce inaccurate, biased, and tainted market prices. As already explained, short sales executed in accordance with SEC rules and regulations not only are lawful, but also

do not distort markets or create a false impression of supply and demand because they are legitimate transactions with real buyers on the other side of the sale who are betting that the stock's price will rise. See Sullivan & Long, 47 F.3d at 864. Contrary to Colkitt's assertion, GFL's short sales did not render its guarantee misleading, and GFL consequently did not have a duty to disclose to Colkitt its intention to engage in short selling. Therefore, because Colkitt failed to create a genuine issue with respect to GFL making an omission of material fact, we will affirm summary judgment in favor of GFL with respect to the securities fraud claim.

## D. REINSTATEMENT OF FEDERAL SECURITIES LAW COUNTERCLAIMS

Colkitt argues that the district court erred when it dismissed his amended counterclaims for lack of specificity on February 2, 1999. He simply states that he pled his amended counterclaims, which span 30 pages, with sufficient specificity pursuant to Fed. R. Civ. P. 9. We need not consider these contentions, however, because, as we have explained, Colkitt failed to create genuine issues of material fact as to certain elements of his corresponding affirmative defenses, and thus, his counterclaims must fail on the merits as well.

## E. VIOLATIONS OF PENNSYLVANIA LAWS

### 1. Securities Claims

Section 1–508 of the Pennsylvania Securities Act bars the basing of certain suits on contracts that violate state securities laws. See Pa. Stat. Ann. tit. 70,S 1–508 (1994). Section 1–401 of the Pennsylvania Securities Act prohibits the use of any "device, scheme or artifice to defraud" and the omission of any "material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading." Id. S 1–401(a), (b). Finally, Pennsylvania common law permits "[t]he recipient of a misrepresentation [to] avoid the contract by showing that the misrepresentation was either fraudulent or material." Germantown Mfg. Co. v. Rawlinson , 491 A.2d 138, 141 (Pa. Super. Ct. 1985). As GFL asserts, these provisions are "functionally identical" to Section 29(b) and

34

Section 10(b) of the Exchange Act. See Rosen v. Communication Serv. Group, Inc., 155 F. Supp. 2d 310, 321 n.14 (E.D. Pa. 2001) ("Section 401 of the Pennsylvania Securities Act is modeled after Rule 10b-5 of the federal securities laws, and requires virtually the same elements of proof."). Therefore, Colkitt's state securities and common law fraud claims fail for the same reasons his federal securities claims fail.

2. Breach of Contract Claim

Colkitt argues that GFL is barred under Pennsylvania law from enforcing the notes because GFL committed a material breach of the contracts by refusing to accept Colkitt's prepayment, even though the notes contain no language prohibiting prepayment. Colkitt claims that he notified GFL in late December 1996 and early January 1997 that he would prepay all outstanding principal and interest on the notes, but GFL improperly rejected Colkitt's request for prepayment in hopes of declaring the notes in default and collecting millions of dollars in penalties.

GFL responds that it did not outright reject Colkitt's request for prepayment, but conditionally accepted the prepayment offer while reserving its rights to dispute the balance due. GFL not only disagreed with Colkitt about the amounts due, but refused to allow Colkitt to dictate the terms of any prepayment. Because of its conditional acceptance of Colkitt's offer, GFL maintains that whether or not the notes permitted prepayment is not at issue. 14 GFL also argues that Colkitt's failure to tender any prepayments -- or any payments, for that matter -- undermines his position that he was attempting to make a full prepayment of outstanding principal and interest.

_____

14. The district court, responding to Colkitt's assertion that the notes do
not permit GFL either to reject or accept conditionally an offer of prepayment, stated that "nothing in the agreements requires GFL to accept prepayment in an amount unilaterally imposed by Colkitt." GFL Advantage Fund, Ltd. v. Colkitt, No. 4:CV-97-0526, Memorandum and Order at 24 (M.D. Pa. Apr. 25, 2000). Thus, the court concluded that "GFL's acceptance while reserving its rights to the disputed amount does not constitute a breach of contract." Id.

35

More importantly, however, Colkitt admitted that he was in material breach of his obligations on the notes before his first prepayment offer. In particular, he was in default on his interest obligations, he failed to maintain a pledge of securities in escrow, and he neglected to file required disclosure documents with the SEC. See Colkitt Dep. at 272-73, 261-62, 195-97 (App. 000581-000582, 000577-000578, 000552-000554). In light of these prior breaches, the district court did not err in granting summary judgment in favor of GFL on its breach of contract claim.

F. DAMAGES

The district court granted GFL damages in the amount of $21,121,989.39. Colkitt argues that the damages should be limited to principal and interest outstanding as of the date of his prepayment request, which would reduce the damages to $11,740,198.

First, Colkitt believes that GFL forfeited its right to collect anything but principal and interest when it rejected Colkitt's prepayment offer. As already addressed, he maintains that GFL's refusal to accept prepayment constituted a breach of contract and that if GFL had accepted his prepayment offer as it allegedly was obligated to do, he would have owed only $11,740,198. Colkitt cannot prevail on this argument, however, as he never actually tendered the $11,740,198 prepayment. Depriving GFL of the interest and penalties due on a balance that Colkitt never paid would reward him unfairly for his breach by allowing him to hold onto GFL's money interest free for nearly four and a half years.

Second, Colkitt argues that GFL is prohibited from recovering both the 20.5%/22% "premium" and the 14% "default interest" because they constitute an unenforceable penalty "that is disproportionate to the value of the performance promised or the injury that has actually occurred." Br. of Appellant at 64 (quoting Finkle v. Gulf & Western Mfg. Co., 744 F.2d 1015, 1021 (3d Cir. 1984)). Colkitt claims that the "premiums" exceed the profit GFL would have been able to earn had it exchanged all of the debt for shares of National Medical and EquiMed and sold the shares on the market. He also insists that adding 14%

"default interest" to the premiums is simply punitive and constitutes unenforceable liquidated damages.

We reject Colkitt's request to reduce the damage award. Both the "premiums" and the "default interest" compensate GFL for distinct economic losses suffered by GFL as a result of Colkitt's breach. The 20.5% and 22% "premiums" represent the grossed-up value of the 17% and 18% discounts guaranteed in the notes. The premiums are intended to restore GFL to the position where it would have been if GFL had been able to convert all of the debt into National Medical and EquiMed stock. In contrast, the "default interest" is intended to compensate GFL for damages it incurred since Colkitt's breach -- namely, the deprivation of its money over the past four and a half years. Not only were these provisions included in contracts that were negotiated at arm's length, but contrary to Colkitt's assertions, they also would restore GFL to the position that it would have held if Colkitt had not breached the notes.

IV. CONCLUSION

For the foregoing reasons, we will affirm the orders of the district court entered on April 25, 2000, and July 17, 2000.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit